[Cite as *State v. Rodriguez*, 2015-Ohio-3875.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No.   101971

---

# STATE OF OHIO

### PLAINTIFF-APPELLEE

## vs.

# JOSE RODRIGUEZ

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-579577-B

**BEFORE:**   Boyle, J., Kilbane, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:**   September 24, 2015

**ATTORNEY FOR APPELLANT**

Steve W. Canfil
55 Public Square
Suite 2100
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Margaret A.   Troia
          Andrew J. Santoli
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Jose Rodriguez, appeals his convictions for aggravated murder and aggravated robbery. Finding no merit to the appeal, we affirm.

Procedural History and Facts

{¶2} In November 2013, Rodriguez (a.k.a. "Leo"), along with codefendant Anthony Soto ("Soto"), was indicted on six counts: aggravated murder in violation of R.C. 2903.01(B); murder in violation of R.C. 2903.02(B); aggravated robbery in violation of R.C. 2911.01(A)(3); robbery in violation of R.C. 2911.02(A)(2); and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2). Each of the counts carried a one- and three-year firearm specification.

{¶3} Rodriguez pleaded not guilty to the charges, and the matter proceeded to a jury trial where the following evidence was presented.

*Fatal Shooting at Salameh Market; Initial Investigation Goes Cold*

{¶4} On the evening of November 11, 2010, around 10:45 p.m., Nashad Atallah was fatally shot in an apparent robbery at the Salameh Market on Daisy Avenue in Cleveland, Ohio. According to the medical examiner, Atallah died from multiple gunshot wounds to the chest and abdomen with skeletal,

visceral, vascular, and soft tissue injuries. The medical examiner observed that Atallah had three separate gunshot wounds and classified the manner of death as "homicide while working."

{¶5} Cleveland police recovered three spent 9 mm Luger casings from the scene and an empty Lay's potato chip bag outside of the market. Both were submitted for testing but no DNA or other forensic evidence was recovered. The witnesses' statements obtained by police revealed that two men with hoodies were seen fleeing from the scene. One witness testified as to seeing the perpetrators' hands when they were running out of the building and identified one as Hispanic and the other individual as African-American. It was also reported that a blue Chevy Cavalier was seen leaving the area following the shooting. The initial investigation did not lead to any suspects, and the case eventually went cold.

*Jonathan Lopez Unknowingly Implicates Himself to FBI Informant; Investigation Revived*

{¶6} Over a year following the homicide, Cleveland police detective Michael Smith, who had been investigating the Daisy Avenue crimes, received a telephone call from FBI special agent David Kohut regarding the case. According to Special Agent Kohut, an informant had contacted him and identified Jonathan Lopez as being involved in the Daisy Avenue crimes. The Cleveland police then elicited Special Agent Kohut's assistance in the

investigation. Det. Smith testified that, after interviewing the informant and following up on his facts, the Cleveland police next conducted an undercover operation in May 2012, suiting the informant with a wire and then having him meet with Lopez, who owed the informant money for drugs.

{¶7} Cleveland police listened and recorded the conversation between Lopez and the informant while it was taking place. During the recorded conversation, Lopez admitted that he was involved in the homicide and mentioned Aaron (nicknamed "AT") as the shooter. Det. Smith testified that Lopez knew facts concerning the robbery and shooting that were not public knowledge. Lopez specifically mentioned that a struggle ensued with the victim, that the victim had been shot three times, and that no money was taken — information that had not been broadcast to the public. Lopez, however, never mentioned Rodriguez in the recorded conversation with the informant.

{¶8} Det. Smith spoke with Lopez on July 2, 2012. On the following day, Lopez came to the police station and met with both Det. Smith and Special Agent Kohut. The interview was cut short because Lopez indicated that he had to leave for school; he was supposed to resume the interview later but Lopez never returned. Cleveland police arrested Lopez on July 17, 2012. On the following day, while represented by counsel, Lopez agreed to an "off-the-record" proffer. Det. Smith testified that Lopez denied any involvement with the robbery and shooting; instead, he implicated his first cousin, Rodriguez,

who he referred to by his nickname, "Leo." Det. Smith further testified that Lopez provided the names of other individuals involved in the shooting, including an individual named "Aaron." Det. Smith testified that, following the taking of Lopez's proffered statement, he did not participate in the follow-up investigation because he retired from the Cleveland police department and transferred jobs.

{¶9} Special Agent Kohut testified that Lopez's proffered statement also identified other individuals being involved, including Eli Camacho — who was later determined to be in prison at the time of the Daisy Avenue offenses, "AD" ("Adrian Santiago"), and Jenson Sota. Lopez, however, did not mention Anthony Soto. According to Lopez's proffered statement, he blamed his cousin Rodriguez and claimed to have gotten his information from Rodriguez.

{¶10} Lopez was indicted on charges of aggravated robbery and aggravated murder in connection with the Daisy Avenue crimes on July 27, 2012. According to Special Agent Kohut, they went forward with the indictment on Lopez, despite his proffered statement pleading innocence because they had the recording where he was bragging about committing these crimes. Special Agent Kohut testified that the taped recording gave them probable cause to arrest Lopez.

{¶11} The Cleveland police continued with its investigation, even after Lopez was indicted.

*Investigation Leads to the Seizure of a Blue Chevy Cavalier tied to Anthony Soto*

{¶12} In September 2012, Detective John Morgan with the Cuyahoga County Sheriff's Office became involved in the investigation after being contacted to assist by Special Agent Kohut. Det. Morgan explained that the original homicide detectives assigned to the case had retired. Det. Morgan testified as to his role in the investigation, beginning with his review of the original homicide investigation reports. According to Det. Morgan, he reviewed all the statements provided by Lopez and then cross-referenced the criminal records of the individuals that Lopez identified, including "AD" — Adrian Santiago. Det. Morgan further explained that he had the original investigation file pulled involving Santiago's 2008 conviction for carrying a concealed weapon and improperly handling a firearm. The file contained information that revealed that a blue, two-door Chevy Cavalier had been involved. Det. Morgan testified that this caught his attention because of a witness's statement indicating that two males exited the store, ran, and jumped "into a blue Chevy two-door car." Det. Morgan then retrieved from the 2008 investigation file the license plate and VIN number of the blue Chevy

Cavalier involved in the offense, and ultimately obtained a search warrant to confiscate the vehicle.

{¶13} Det. Morgan testified that, on October 15, 2012, law enforcement officials executed the search warrant at the address of Soto's mother, the licensed owner of the vehicle. From Soto's mother, they learned that her son, Soto, was the primary driver of the vehicle in 2010. Soto was present when the police executed the search warrant on the vehicle.

*Special Agent Kohut Interviews Rodriguez Regarding Lopez's Allegations*

{¶14} Special Agent Kohut testified that he first interviewed Rodriguez on February 27, 2013, when Rodriguez appeared for the trial against Lopez that never went forward, and then again on August 6, 2013. During the August 2013 interview, Special Agent Kohut played Lopez's proffered statement, paying close attention to Rodriguez's reaction. According to Special Agent Kohut, Rodriguez "smirked a few times, and then he eventually laid his head on his hand." Special Agent Kohut further testified that Rodriguez indicated that he was "mad" about his cousin's allegations and then upon further questioning, "his eyes started to tear up, his voice started to get high and very low, so there was definitely what I observed, was a definite reaction."

{¶15} Special Agent Kohut also acknowledged that their investigation

identified Jose Ortiz as a suspect, who law enforcement learned had been contacting potential material witnesses in the case against Lopez. The record further revealed that Lopez gave the name of Jose Aaron Ortiz in his proffered statement. Special Agent Kohut further acknowledged that he investigated whether Lopez's father, Felix Lopez, Sr., was harassing witnesses in his son's case and testified that he told Felix to leave witnesses alone.

*Soto Provides Proffered Statement Implicating Himself, Rodriguez, and James Moore*

{¶16} In September 2013, approximately one year after seizing the blue Chevy Cavalier, Det. Morgan learned of Soto's desire to talk about the homicide and robbery that occurred on November 11, 2010. At this time, Soto was not under indictment. On October 4, 2013, Soto, while represented by counsel, gave a proffered, written statement. Det. Morgan testified that Soto provided a handwritten admission of the events that occurred on Daisy Avenue, implicating himself, Rodriguez, and James Moore.

{¶17} Det. Morgan then investigated Soto's account of the events, speaking with various witnesses, including Keith Williams and Mirelsa Capeles a.k.a. "Princess." Princess corroborated Soto's story that he, Rodriguez, and Moore had all been hanging out at her and Keith's apartment on the evening of November 11, 2010. She testified that she heard Rodriguez

talking to Moore about "robbing a Radio Shack," to which she told them that they were "dumb," prompting Rodriguez to tell her to mind her own business.

{¶18} Det. Morgan further testified that, while the case was pending against Lopez, Felix (Lopez's father) directed Det. Morgan to speak with Travis Light. Light led the investigation to Isela Vega, who provided a statement implicating Rodriguez.

{¶19} Shortly thereafter, on November 5, 2013, Soto and Rodriguez were indicted on the underlying charges, and the case against Lopez was dismissed. Following their indictments, Det. Morgan obtained a search warrant for both of their cell phone records covering the time period of the Daisy Avenue shooting. Det. Morgan testified that the state had not yet indicted Moore, who was then at Northcoast Behavioral Healthcare and not competent to stand trial.

*Lopez Denies Any Involvement in the Underlying Crimes at Trial But Cannot Recall What Rodriguez Told Him About The Daisy Avenue Crimes*

{¶20} Prior to trial, the state filed a motion to have Lopez declared an adverse witness. Over defense counsel's objection, the trial court granted the motion, and the state called Lopez at trial.

{¶21} Lopez, age 23 at trial, testified that Rodriguez was his first cousin and that prior to November 2010, they had regularly kept in contact, seeing each other on the weekends and communicating by text message and phone

calls. According to Lopez, they maintained a "very close relationship."

{¶22} Lopez testified that he had a "cordial conversation" with his cousin regarding the Daisy Avenue crimes but could not remember any of the details. Lopez acknowledged providing a written, proffered statement to law enforcement on July 18, 2012, but could not remember the contents. The prosecutor proceeded to read excerpts from Lopez's statement, including references to Lopez stating that Rodriguez told him that "[he] robbed the store on Daisy" and that "[he] shot the guy, killed him * * * [Rodriguez] was just stressing about the whole situation." Lopez, however, repeatedly indicated that he did not remember.

{¶23} Lopez also testified that he was not present at the Salameh Market on November 11, 2010, despite telling the police in one of his earlier statements that he had been. On cross-examination, he further agreed that he had indicated in his statement that his cousin "would never really tell me anything personal."

*Codefendant Soto Testifies at Trial and Directly Implicates Rodriguez in the Robbery and Murder*

{¶24} Soto testified at trial. At the time of trial, he was 24 years old and working as the general manager of Panera in Highland Heights. He testified as to the events leading up to the homicide on Daisy Avenue. On that evening, he went to Keith's apartment on Fulton Avenue, where a group of

people was already hanging out — AD, Moore, and Princess (Keith's girlfriend who lived there). According to Soto, Rodriguez showed up sometime after him. Keith left for work around 10:00 p.m. but the rest of them stayed, playing cards, smoking, and talking about being "short on cash." The conversation led to "doing a robbery," and Moore pulled out his gun, showing both Rodriguez and Soto. Soto further testified that Rodriguez brought up the market on Daisy and then they all discussed robbing that store, prompting the three of them to leave and drive to the market.

{¶25} Soto drove the vehicle, a blue Chevy Cavalier (two-door) and parked it in the alley near the market. Soto walked inside the market "to check what's going on in the store," while Rodriguez and Moore remained in the car. Once inside the market, Soto bought a bag of chips and then returned to his vehicle and told Rodriguez and Moore that there was only one clerk inside. Soto then looped around Daisy one more time and ultimately parked between Daisy Avenue and Library Court alley, facing south. Soto turned off his lights but left the engine running while Rodriguez and Moore exited the car and entered the market store with bandanas covering their faces from the nose down. Soto testified that they were running back to his car "two, maybe three minutes" later. Once inside the car, Rodriguez was cursing and very worked up, asking Moore "why did you shoot the guy?" Moore responded by saying, "I had to, he resisted."

{¶26} They all three then drove to Taco Bell, where Keith was working. They stayed there for maybe ten minutes and then returned to Keith's apartment for another brief amount of time. Soto testified that he then headed back toward his mother's residence, off of West 117th Street, driving around first while his mind was racing. He testified that he did not want to go home right away.

{¶27} According to Soto, Rodriguez called him the next morning and told him that the clerk died. The news of the clerk's death put Soto in "self-preservation mode." He placed his car on the third floor of the parking garage near his work and rode the bus to work. He told his mother that his car "broke down." He "laid low" for a while and stopped hanging out with his normal group of friends, including Rodriguez and Keith.

{¶28} On cross-examination, Soto acknowledged that he believed he was in trouble when law enforcement agents came to his house to seize the Chevy Cavalier. That encounter prompted him to retain an attorney. Prior to giving his proffer statement, he further acknowledged that he believed that he had been identified as the driver of the vehicle and that he was concerned about a potential life sentence. Soto also admitted on cross-examination that some of the facts in his September 5, 2013 statement were false, such as Keith being at the apartment with them after the shooting or that they all hung out together for a couple of hours following the shooting. Soto testified that he was indicted on November 5, 2013, along with Rodriguez, but that he had been released on bond by paying $2,500 where Rodriguez was kept on a million dollar bond.

*Cell Phone Records Place Rodriguez's and Soto's Cell Phones in the Vicinity of the Salameh Market and Corroborate Soto's Account*

{¶29} The state also offered the testimony of Todd Wiles, a civilian crime analyst with the Cleveland Police Department, who analyzed and mapped the cell phone records of Soto and Rodriguez relating to a four-hour period beginning on November 11, 2010 at 9:00 p.m. and ending the following morning at 1:20 a.m. Wiles testified that the cell phones identified as being used by Rodriguez and Soto were both located in the cell tower sector that covered the Salameh Market on Daisy Avenue around the time of the crimes. Specifically, Wiles identified Rodriguez's cell phone as being in the Daisy Avenue area at 10:31 p.m., 10:34 p.m., and 10:42 p.m. and then jumped to 10:46 p.m., 10:47 p.m., 10:48 p.m., and 11:00 p.m., placing that cell phone in the Fulton, Memphis area.

{¶30} Similarly, records revealed that Soto's cell phone was utilizing a tower at 10:41 p.m. near MetroHealth, which is near Daisy Avenue, and that the cell phone was still in that area at 10:42 p.m. At 10:51 p.m., the records indicate that Soto's cell phone had moved away from the sector that covers Daisy Avenue and had moved southwest in the area of Fulton and Memphis. According to Wiles, at 11:00 p.m., "maps indicating that the cell phones are bouncing off the same sectors of the same antenna on the same tower." At 11:04 p.m., Soto's cell phone called Rodriguez's cell phone and Soto's cell phone started traveling north out of the Memphis, Fulton area. Wiles further testified that the two cell phones "appear to be making calls in the same

general area up until roughly midnight," but that by 1:00 a.m., Soto's cell phone was in Lakewood and Rodriguez's cell phone remained in the Detroit-Shoreway area.

{¶31} On cross-examination, Wiles acknowledged that the cell phone records cannot pinpoint a person's exact location; rather, the records can only place the phone in a general sector area. He further stated that each sector includes a radius spanning from five to 20 blocks and that sometimes a person could be in sector A but the call is being connected to sector B.

*Isela Vega Testifies that Rodriguez Confessed to the Shooting*

{¶32} The state called Isela Vega, who reluctantly testified after being held in jail for two days on contempt charges for refusing to testify. She testified that she was "scared" to testify because she had children. Vega testified as to a specific conversation that she had with Rodriguez at her home wherein Rodriguez told her that "he went into a store" and "he killed somebody." Vega further testified, however, that she did not remember anything more. The state then allowed Vega to read the statement that she provided to the police in October 2013 to refresh her memory. After reading the statement to herself, Vega testified further that Rodriguez told her that the guy that he shot had no money and that he was Arabic. She also stated that she "just remembered him asking for something to drink. I don't know what he did with it."

{¶33} On cross-examination, Vega admitted that she did not know Rodriguez very well and that she had seen him maybe once or twice in her life. She further testified that Rodriguez came to her house on Carrington Avenue — off of West 130th Street. Vega confirmed that she knew Travis Light, who was her daughter's boyfriend, and that Light was instrumental in having Det. Morgan take her statement. Vega, however, denied Light being at her house when she encountered Rodriguez and denied any dice game going on there.

{¶34} Defense counsel further questioned Vega regarding her statement, reading excerpts of it relating to her giving Rodriguez a gallon of milk and her questioning him why he needed it. In her statement, Vega described Rodriguez, fully clothed, pouring a gallon of milk all over himself in the shower and that he "told us he wanted to clean the gun stuff off his hands." In response to defense counsel's question, Vega denied being afraid to testify on the grounds that she might be charged with perjury.

{¶35} Following the state's presentation of its 26 witnesses, the state rested. Rodriguez moved for a Crim.R. 29 acquittal of all the charges, which the trial court denied. Rodriguez presented no witnesses on his behalf but moved to admit several exhibits, including the subpoenas issued to many of the state's witnesses to appear at trial in the case that had been pending against Lopez.

{¶36} The jury found Rodriguez guilty on all counts of the indictment. Following the trial court's merger of the allied offenses, the state elected to proceed on the aggravated murder and aggravated robbery counts for sentencing. The trial court imposed a total prison term of 21 years to life.

{¶37} Rodriguez now appeals, raising the following four assignments of error:

> I. The trial court committed plain error in violation of appellant's rights to due process, a fair trial and right of confrontation, in violation of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution in permitting the prosecutor to read into the record the unsworn statements of witnesses.
>
> II. The state's evidence was insufficient to support appellant's convictions.
>
> III. Appellant's convictions are not supported by the manifest weight of the evidence.
>
> IV. Appellant was deprived of his constitutional right to effective assistance of trial counsel.

Admission of Evidence

{¶38} In his first assignment of error, Rodriguez argues that the trial court erred in allowing the prosecutor to read its own witnesses' unsworn statements as substantive evidence against him, in violation of the Rules of Evidence.

{¶39} Rodriguez, however, concedes that his trial counsel did not object to the testimony that he now challenges on appeal. Accordingly, we review

for plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Even if the error satisfies these prongs, appellate courts are not required to correct the error. Appellate courts retain discretion to correct plain errors. *Id.* Courts are to notice plain error under Crim.R. 52(B), "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." (Citation omitted.) *Id.*

### A. *Jonathan Lopez*

**{¶40}** Rodriguez first argues that the trial court should not have allowed the prosecutor to use Jonathan Lopez's written, unsworn statement as substantive evidence against Rodriguez. He contends that the state (1) failed to establish surprise and affirmative damage to warrant the state's impeachment of its own witness with the witness's unsworn statement as required under Evid.R. 607(A), and (2) Lopez was not deemed an adverse witness under Evid.R. 611. He further argues that the written statement was not admissible as a past recollection recorded under Evid.R. 803(5).

**{¶41}** Evid.R. 607 provides that

The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.

**{¶42}** Evid.R. 611(C) states in pertinent part, "[W]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

**{¶43}** Here, even assuming that the prosecutor should not have been allowed to read portions of Lopez's statement, we can neither say this alleged error was obvious nor affected the outcome of the proceedings. Rodriguez fails to satisfy the plain error standard. First, the record reflects that the trial court *had* declared Lopez an adverse witness prior to his testifying. Thus, under Evid.R. 611(C), the state was entitled to ask Lopez leading questions in its direct examination of him. *See also In re K.S.*, 8th Dist. Cuyahoga No. 97343, 2012-Ohio-2388 (recognizing that a prosecutor is entitled to question adverse witness on direct using leading questions pursuant to Evid.R. 611(C)).

**{¶44}** And while the state was not permitted to impeach Lopez with his prior statement to the police without satisfying Evid.R. 607(A) by showing surprise and affirmative damage, it is not clear from the record that the prosecutor was impeaching Lopez. The record reflects that Lopez initially stated that he did not remember what Rodriguez told him. Upon further questioning, he stated that his cousin did not tell him any details, prompting

the prosecutor to inquire about Lopez's prior, written proffered statement. After being shown his statement, Lopez still did not recall any of the details; instead, he repeatedly answered the prosecutor's leading questions by stating, "I do not remember." Lopez never recanted his statement.

{¶45} Because the bulk of Lopez's testimony was that he did not remember the statements that Rodriguez made regarding the Daisy Avenue crimes, it is not entirely obvious if the prosecutor's reading of the portions of the statement was error. This court has previously found no error when a prosecutor read portions of an adverse witness's statement on direct while leading the witness to develop his testimony. *See State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693 (recognizing the fine distinction between impeaching a witness with a prior inconsistent statement and leading an adverse witness to develop testimony consistent with the witness's prior statement). Under those circumstances, such questioning does not invoke Evid.R. 607. *Id.*

{¶46} Finally, Rodriguez fails to establish how this testimony affected the outcome of the trial. The fact that Lopez had implicated Rodriguez was known to the jury prior to Lopez even testifying. This information properly came in through Det. Smith, who explained the police's initial investigation. Further, Lopez's statement was proven to contain false allegations and could be viewed with grave suspicion given that he was facing an arrest on the

charges and therefore wanted to deflect the blame. Notably, as emphasized by defense counsel at trial, the police did not even believe Lopez's proffered written statement because they indicted him immediately after. We fail to see how his statement is so prejudicial to affect the outcome of the trial.

{¶47} Moreover, the jury heard from Soto, who detailed Rodriguez's role in committing the offenses. Soto's account expressly implicated himself, which he first offered to the police when he was neither under arrest nor indictment. Additionally, crucial aspects of Soto's testimony was corroborated by neutral witnesses. For example, Princess and Keith specifically testified as to Soto, Rodriguez, and Moore being present at their apartment on the evening of November 11, 2010. Princess further testified as to Rodriguez talking about doing a robbery and that he specifically told her to be quiet upon her commenting that "they were dumb." The state also offered the evidence of the cell phone records that placed both Rodriguez and Soto in the vicinity of the Salameh Market on Daisy Avenue during the time period of the offenses and corroborated Soto's account for their whereabouts following the murder. Finally, the record reveals that Rodriguez is Hispanic and Moore is African-American; their ethnicity matched the description provided by one of the witnesses who observed the two perpetrators running from the scene.

{¶48} Having found no plain error, we need not address the state's contention that the statement would have been admissible pursuant to the hearsay exception contained in Evid.R. 803(5) for recorded recollection.

{¶49} Accordingly, we find no plain error in the prosecutor's reading of Lopez's unsworn prior written statement.

*B. Isela Vega*

{¶50} Rodriguez next argues that the trial court committed plain error in allowing the prosecutor to read portions of Isela Vega's prior written statement to impeach her and to improperly use her statement as substantive evidence against him. This argument has no merit.

{¶51} The record reflects that the state did not read any portions of Vega's statement in its direct examination of her. Nor did it attempt to impeach her. Instead, the state allowed Vega to silently read over her statement to refresh her recollection of the events in question. Conversely, defense counsel on cross-examination read excerpts of Vega's statement as a means to impeach her. Thus, neither Evid.R. 607 nor 611 apply here.

{¶52} On redirect, however, the state asked Vega to read her entire response to some of the questions given in the statement as opposed to the limited excerpts read by the defense counsel.

> Where, on cross-examination, a witness is impeached by a showing of prior statements made by him in a written instrument apparently inconsistent with his statements on direct

examination, reference to other statements in the same document used to impeach him is proper for the purpose of rehabilitation, where such other statements are consistent with the statements made on direct examination or are in explanation of such apparent inconsistency and do not serve to inject new issues into the case.

*Shellock v. Klempay*, 167 Ohio St. 279, 148 N.E.2d 57 (1958), paragraph two of the syllabus. Generally, courts have found that once defense counsel reads a statement on direct it opens the door for the prosecutor to read the entire statement in rebuttal to rehabilitate the witness. *See, e.g., State v. Monroe*, 8th Dist. Cuyahoga No. 94768, 2011-Ohio-3045, ¶ 47; *State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, ¶ 47.

{¶53} While the prosecutor's reading of additional excerpts from Vega's statement did not rehabilitate her testimony on direct, it does not appear to add additional evidence into the record. The responses were cumulative to what was either said on direct or read during cross-examination. Any error therefore would be harmless, not grounds for reversal and certainly not a matter of plain error.

{¶54} The first assignment of error is overruled.

<u>Sufficiency of the Evidence</u>

{¶55} In his second assignment of error, Rodriguez challenges the sufficiency of the evidence in the record to support his convictions. He contends that the evidence overwhelmingly established the guilt of one person

— Lopez — and that the only other evidence supporting his conviction was either inadmissible or not credible. We find his arguments unpersuasive.

{¶56} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶57} Rodriguez was charged with aggravated murder under R.C. 2903.01(B), which provides

> [n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶58} He was also charged with aggravated robbery under R.C. 2911.01(A)(3), which provides that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, * * * shall * *

* inflict, or attempt to inflict, serious physical harm on another."

**{¶59}** Although Rodriguez couches his argument as a sufficiency challenge and cites the governing standard, he does not argue that the state failed to present sufficient evidence in regard to any specific element of the crimes. Instead, he argues that "without the introduction of the inadmissible prior statements of the state's witnesses, the state presented insufficient evidence of [his] guilt." This argument, however, provides no basis to sustain a sufficiency challenge because "a reviewing court must consider all the testimony that was before the trial court, whether or not it was properly admitted." *In re K.S.*, 8th Dist. Cuyahoga No. 97343, 2012-Ohio-2388, ¶ 30, citing *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 25 (recognizing that "when evidence admitted at trial is sufficient to support a conviction, but on appeal, some of that evidence is determined to have been improperly admitted, the Double Jeopardy Clauses of the United States and Ohio Constitutions will not bar retrial").

**{¶60}** To the extent that Rodriguez broadly attacks the integrity of the state's investigation as well as Soto's testimony, this argument goes to the credibility of the witnesses, which is not proper on review for evidentiary sufficiency. *See State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. These arguments go to the manifest weight of the evidence that we will address under his third assignment of error. But as for

Rodriguez's sufficiency challenge, we find that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. Indeed, Soto's testimony directly establishes each element of the offenses.

{¶61} The second assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

{¶62} In his third assignment of error, Rodriguez argues that his conviction is against the manifest weight of the evidence.   We disagree.

{¶63} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.   Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence.   *Id*., citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶64} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.*   In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id*.

{¶65} Rodriguez argues that the testimony of the state's witnesses was "contradictory and incredible." He broadly alleges that Lopez's father corrupted witnesses as a means to exonerate his son and that such evidence severely undermined the credibility of the state's witnesses. He further claims that the only credible evidence was Lopez's secretly recorded conversation where Lopez confesses to executing the robbery along with Aaron and identifies Aaron as the shooter. We disagree.

{¶66} Even if the jury agreed with Rodriguez's claim that Lopez's father "corrupted" the investigation into the Daisy Avenue offenses, this theory only discredits the testimony of Vega and Light. These are the only two witnesses that are arguably associated with Felix. Light acknowledged Felix contacting him and, although Vega denied having contact with Felix, Light brought Vega to Det. Morgan. Thus, disregarding these witnesses' statements, the jury still had Soto's testimony. And we cannot say that the jury lost its way in finding Soto credible, especially since the state additionally offered circumstantial evidence supporting Soto's account.

**{¶67}** We likewise do not agree that Lopez's secretly recorded conversation trumped all of the state's other evidence. The circumstances surrounding the conversation revealed that Lopez was speaking to his drug dealer and essentially bragging about the Daisy Avenue offenses. Although Lopez admittedly knew facts about the offenses that were not known to the public, the jury obviously believed that Lopez learned this information from Rodriguez. The record established that Lopez and Rodriguez were first cousins and close friends and in regular contact in November 2010. We do not find it so unbelievable that the jury believed that Lopez was lying to his drug dealer at the time of the secret recording.

**{¶68}** Accordingly, we do not find that this is the exceptional case where the evidence weighs heavy against the conviction.

**{¶69}** The third assignment of error is overruled.

<u>Ineffective Assistance of Counsel</u>

**{¶70}** In his final assignment of error, Rodriguez argues that he was deprived his constitutional right to effective assistance of counsel. We disagree.

**{¶71}** Reversal of a conviction for ineffective assistance of counsel requires a defendant to show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *State v. Smith*, 89 Ohio St.3d 323, 327, 731 N.E.2d 645 (2000), citing *Strickland v. Washington*, 466

U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel's performance must fall below an objective standard of reasonableness to be deficient in terms of ineffective assistance of counsel. *See State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Moreover, the defendant must show that there exists a reasonable probability that, were it not for counsel's errors, the results of the proceeding would have been different. *State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998).

{¶72} To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶73} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland*, 466 U.S. at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶74} Rodriguez argues that his trial counsel was ineffective in failing

to challenge "seriously improper evidence." He first broadly attacks the admission of "cell phone information," arguing that some of the cell phone information provided was "flawed" and, therefore, the "resulting analysis was totally unreliable." Rodriguez, however, fails to cite any portion of the record in support of this sweeping claim. Nor does he offer any authority in support of his claim that his trial counsel was deficient. It is not the court's duty to develop and flush out an appellant's argument. *See* App.R. 12(A)(2) and 16(A)(7).

{¶75} Moreover, our review of the record reveals that, although AT&T had initially responded to the state's subpoena with inaccurate records, that mistake was corrected. There is no evidence in the record to support Rodriguez's claim that the analysis of the cell phone records was based on any flawed or inaccurate information. We, therefore, cannot agree that the defense counsel was deficient in failing to object to the admission of the "cell phone information."

{¶76} Next, Rodriguez broadly argues that defense counsel should have "objected to the flagrant use of unsworn statements as substantive evidence" against him. Again, he fails to cite to the record in support of this claim. It appears, however, that he is challenging the prosecutor's questioning of Lopez and Vega with the use of their prior unsworn written statement. Defense counsel's decision not to object to the prosecutor's reading portions of Vega's

statement on redirect appears to have been a tactical decision. The testimony highlighted how incredible Vega's testimony seemed. Moreover, the testimony was cumulative to other testimony already offered. As for the questions asked of Lopez on direct, Rodriguez fails to establish any prejudice. Again, Lopez was not a credible witness, which was established by the state's own actions in indicting Lopez after he provided the statement denying all involvement and implicating Rodriguez. We cannot agree that a reasonable probability exists that, in the absence of this evidence, the jury would not have convicted Rodriguez.

{¶77} Finally, Rodriguez argues that his defense counsel was deficient by essentially agreeing "during arguments on his Crim.R. 29 motion for acquittal that Anthony Soto's testimony, alone, could be sufficient to support a conviction." He contends that the testimony of a codefendant alone cannot be grounds for a conviction in this case. Rodriguez, however, is wrong. R.C. 2923.03, which governs complicity, was amended in 1986 and no longer stands for the proposition that Rodriguez asserts. Instead, R.C. 2923.03(D) provides the following:

> (D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶78} And in this case, the record reflects that the trial court provided the required jury instruction.

{¶79} Accordingly, having found no merit to Rodriguez's ineffective assistance of counsel claim, we overrule the fourth assignment of error.

{¶80} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., and
TIM McCORMACK, J., CONCUR