[Cite as *State v. Shivers*, 2018-Ohio-5174.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106601**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**DORJAN M. SHIVERS**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-584116-A

**BEFORE:** McCormack, J., Kilbane, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** December 20, 2018

**ATTORNEYS FOR APPELLANT**

Myron P. Watson
1144 Rockefeller Bldg.
614 West Superior Ave.
Cleveland, OH 44113

Anthony D. Jordan
614 W. Superior Ave., Suite 1144
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Jeffrey Schnatter
Christine M. Vacha
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113


TIM McCORMACK, J.:

{¶1}    Defendant-appellant Dorjan M. Shivers appeals from his convictions for rape and kidnapping following two jury trials.   For the reasons that follow, we affirm the convictions.

I. Procedural History

{¶2}    On April 16, 2014, Shivers was charged in a multiple-count indictment pertaining to acts allegedly committed against two victims, A.T. and A.C., on two separate occasions.   The first three counts stem from acts committed against A.T. on May 18, 2013, and they include: Count 1 — rape in violation of R.C. 2907.02(A)(2), with a sexually violent predator specification; Count 2 — rape in violation of R.C. 2907.02(A)(1)(c), with a sexually violent

predator specification; Count 3 — kidnapping in violation of R.C. 2905.01(A)(4), with a sexually violent predator specification and a sexual motivation specification.

{¶3} The remaining four counts pertain to acts committed against A.C. on January 11, 2013, and they include: Count 4 — rape in violation of 2907.02(A)(2) (digital penetration), with a sexually violent predator specification; Count 5 — rape in violation of 2907.02(A)(2) (vaginal intercourse), with a sexually violent predator specification; Count 6 — gross sexual imposition in violation of 2907.05(A)(1), with a sexually violent predator specification; and Count 7 — kidnapping in violation of 2905.01(A)(4), with a sexually violent predator specification and a sexual motivation specification.

{¶4} Shivers filed a motion to sever the counts in the indictment as they pertained to each alleged victim. The court denied his motion, and the matter proceeded to trial. On March 29, 2017, the jury returned the following verdict: not guilty of Count 1 (rape), Count 3 (kidnapping), Count 6 (gross sexual imposition), and guilty of Count 2 (rape). The jury was hung on Counts 4, 5, and 7, all of which pertain to acts allegedly committed against A.C. The court then declared a mistrial on Counts 4, 5, and 7 and scheduled a new trial on those remaining counts. The state agreed to dismiss the sexually violent predator specification on Count 2.

{¶5} On October 2, 2017, Shivers waived his right to a jury trial on the sexually violent predator specifications (on Counts 4, 5, and 7) and the sexual motivation specification (on Count 7). On October 12, 2017, the jury found Shivers guilty of all remaining counts: rape (Counts 4 and 5) and kidnapping (Count 7). The court found Shivers not guilty of the sexually violent predator specifications and guilty of the sexual motivation specification. At sentencing, the court merged the kidnapping conviction in Count 7 with the rape conviction in Count 4. The

court then imposed a prison sentence of five years each on Counts 2, 4, and 5, to be served concurrently.

## II. Assignments of Error

**{¶6}** Shivers now appeals his convictions, raising six assignments of error. For judicial clarity and ease of discussion, we address the following errors out of order where appropriate:

I.   The prosecutor engaged in prosecutorial misconduct by impermissibly commenting that the appellant's time to say "no" had passed, which was an improper comment on his right not to testify, and was irrelevant to any factual issues in the case.

II.   The trial court erred when it denied the [appellant's] motion for mistrial when the state of Ohio failed to timely provide a written statement of A.C., which was a discovery violation, and denied [the appellant] due process of law.

III.   The trial court erred when it failed to grant [the appellant's] motion for separate trials, and this failure denied him a fair trial, thus violating his right of due process.

IV.   The trial court erred when it denied the appellant's motion for judgment of acquittal for rape (substantial impairment) when the state's evidence was insufficient as a matter of law.

V.   The trial court erred when it accepted the verdicts of the jury although one of the jurors did not affirm her verdict and there was no unequivocal assent to the verdict.

VI.   The trial court erred when it admitted over the defense's objections to the admission of the former testimony of A.C. in the first trial, in violation of Evid.R. 804, without a showing of unavailability.

## III. Evidence at Trial

**{¶7}**   The state presented the following witnesses:   (1) alleged victim, A.C.; (2) Mayfield Heights Police Corporal Joseph Leskovec; (3) Mayfield Heights police detective Sergeant Donald Oberdoester; (4) alleged victim, A.T.; (6) Euclid police officer David Maslyk;

(7) A.T.'s mother, E.T. ("Mother"); (8) A.T.'s friend, Tyler Hawkins; and (9) A.T.'s friend, Keeada Johnson.   The defense presented one witness:   A.C.'s former boyfriend, Gerald Reid.

<u>A.C.</u>

{¶8}   From October 2012 to January 2013, A.C. worked as a server at Pizza Hut in Cleveland.   A.C. testified that during the time she worked at Pizza Hut, she became friends with the defendant, Dorjan Shivers, who was a supervisor at Pizza Hut.   A.C. stated that she and Shivers were not romantically involved.   During this time, A.C. was dating Gerald Reid, who was in the military and stationed in New Jersey.

{¶9}   On January 1, 2013, Pizza Hut terminated A.C., but she and Shivers remained in touch through text messaging and "casual conversation."   At some point in January, Shivers and A.C. decided to "kickback" and "hang out with other people and just relax."   A.C. described a "kickback" as "a lot of people coming over, or several people coming over, food, maybe watching [television], very relaxed environment."   She stated that it was Shivers's idea to go to his apartment in Mayfield Heights.

{¶10} Shivers picked A.C. up the evening of January 11 and drove to his apartment. When they arrived, there was only one other person in Shivers's apartment, Shivers's cousin. Shivers poured A.C. a blue alcoholic beverage, introduced A.C. to his cousin, and then led A.C. to his bedroom.   A.C. testified that she was "kind of shocked" that there was no one else in the apartment.

{¶11} Once in the bedroom, they both sat on the edge of the bed, with her feet hanging off to the side, and there was some space between the two of them.   A.C. testified that after approximately 15 minutes of watching television and conversing, Shivers began touching her breast and attempted to hug her.   She told him to stop, and she pushed his arm away from her

body. A.C. stated that he stopped briefly and then began to "play wrestle," explaining that Shivers was hugging her and trying to get her to lie back on the bed. A.C. told Shivers, "No, no, stop, get up," and she sat up. After briefly stopping, once again, Shivers "bear hug[ged]" A.C. and wrestled her so that her back was on the bed. At this point, A.C. told Shivers that she had a boyfriend and she told him to stop. A.C. testified that she was "very firm" in telling Shivers to stop multiple times and she "definitely did communicate * * * to him that [she] did not want to have any kind of sexual activity with him."

{¶12} After A.C. told Shivers about her boyfriend, Shivers briefly stopped his advances, and then for the third time, Shivers pulled her down to the bed. A.C. stated that she resisted, but because he was stronger than A.C., he continued to pull her down. She began to "scoot" away from him, toward the wall, telling him "no." At this point, Shivers got on top of A.C. and put his hands in her pants and then in her underwear. She continued to say "no" and tried to remove his hand while scooting toward the wall. A.C. stated that rather than stopping, Shivers continued his behavior "more forcefully." She explained that he fondled her vaginal area and then penetrated her with his finger. A.C. testified that as Shivers became more aggressive, she became "a little scared" and "shock[ed]." She stated that she began to resist less because she "started to go a little numb,""emotionally * * * withdraw[n]."

{¶13} A.C. then testified as follows:

He started unbuttoning his pants and he tried to pull my pants off and I pulled my pants back on, and then he tried to take them off again.

* * *

I kept repeating "I can't do this."

* * *

After I pulled my pants back up, he pull[ed] my pants back down again, this time with my underwear, and he pull[ed] his pants off as well, and I'm still a little shocked at this point about what's going on and [I'm] scared.

\* \* \*

He inserted the tip of his penis into my vagina, and then he paused for a few seconds and he reach[ed] over to the small little desk and he grab[bed] a condom and he put[] it on and he continues to have sex with me. \* \* \* He put his penis inside of [my vagina] and repeatedly put it inside of me.

{¶14} When Shivers finished, he went into the bathroom. A.C. looked for her cell phone. Finding it on the floor, she crouched down and called her boyfriend. A.C. stated that she was crying when she told her boyfriend "everything." When she heard the bathroom door open, she hung up the phone. Shivers then drove A.C. home.

{¶15} When A.C. arrived home, she called her boyfriend again to explain what happened. She testified that she was crying and she was "a little hysterical." She took a shower before she went to bed. The next day, A.C. telephoned a friend, Renee, and told her what happened. A.C. testified that Renee offered to drive her to the police station, and A.C. accepted her offer. Two days after the alleged rape, A.C. filed a police report. Thereafter, she went to the hospital, where a sexual assault nurse examiner ("SANE") examined her.

{¶16} Reid, A.C.'s boyfriend on January 11, 2013, testified that A.C. told him earlier that day that she was going to a party in the evening. He stated that A.C. called him that evening, extremely upset and crying. A.C. told him she had been raped. Reid testified that it was a very short conversation. When they spoke again that evening, A.C. was still upset and crying, and she explained to Reid in more detail what happened at Shivers's apartment.

{¶17} Corporal Leskovec received A.C.'s sexual assault report on January 13, 2013, and met with A.C. Thereafter, he scheduled an interview with Shivers. Both Corporal Leskovec

and Detective Oberdoester interviewed Shivers. Corporal Leskovec completed his initial report, and Detective Oberdoester took the case from there. The detective testified that after interviewing Shivers, he attempted numerous times to contact A.C. to no avail.

A.T.

{¶18} A.T. was a high school student in May 2013. On the evening of May 18, A.T. and two friends, Tyler and Keeada, decided they wanted to hang out. A.T. went to Tyler's house first and then Tyler's mother drove them to Keeada's house. The friends decided to hang out at Tyler's friend's place. This friend was Dorjan Shivers. A.T. explained that there was no discussion regarding plans for that day. All she knew was that they were going to Tyler's friend's place. She did not know if Tyler and Keeada had planned to visit the friend and A.T. was "just tagging along." A.T. learned of the plan when she and Tyler arrived at Keeada's house. A.T. understood that the three of them were going to "chill with these guys," meaning "hang out, go over their house." A.T. did not know the other people.

{¶19} Shivers, accompanied by two other men, picked up the three friends. He drove everyone back to his apartment.

{¶20} Arriving at the apartment, A.T. observed a "stripper pole" in the middle of the living room and "a lot of gelatin (Jello) shots" in the kitchen. She talked only to Tyler initially because, she stated, she felt comfortable around her.

{¶21} A.T. testified that there was drinking and there were drugs at the party, and although she had never had alcohol before this night, she was drinking alcohol that night in Shivers's apartment. She stated that she had one Jello shot and what she believed to be two shots of tequila. At some point, however, she learned that they were double shots of tequila.

She also smoked marijuana. A.T. stated that she was feeling different, not normal, after drinking. She remembered feeling "tipsy, drunk, like really drunk."

{¶22} A.T. remembered that, after drinking, Shivers picked her up off the couch in the living room and carried her to the bedroom. At the time, they had not been talking to each other. When they got to the bedroom, Shivers began kissing her and tried to pull her skirt down. She remembered pulling her skirt back up and telling Shivers "no." A.T. testified that Shivers did not stop. At this point, Keeada came into the bedroom and walked right back out. Shivers left the bedroom as well. A.T. remembered then trying to pull her skirt back up again and she "passed out on the bed and fell asleep."

{¶23} The next thing A.T. remembered was seeing a flash that awakened her and then seeing Shivers pull her skirt down again. He proceeded to have sex with her, despite A.T. telling him to stop. She stated that she was physically unable to get "him off [her]."

{¶24} When Shivers finished, he left the room, and A.T. called her boyfriend, crying. She told her boyfriend that Shivers raped her. A.T. stated that her boyfriend then called A.T.'s mother and they had a three-way conversation. While A.T. was on the phone with her mother and her boyfriend, Tyler came into the bedroom and hung up the phone. A.T. was still crying when Tyler confronted Shivers and demanded to know what happened. A.T. told Tyler that Shivers raped her. A.T. testified that she told Tyler "the guy in the red shirt" raped her, explaining that she "knew who it was, but [she] couldn't use her words." She identified Shivers as the only man who was wearing a red shirt that night.

{¶25} After the confrontation, A.T., Tyler, and Keeada engaged in a verbal altercation, but A.T. cannot recall what the fight was about. Someone then drove the girls back to Keeada's house. She vomited on the way to Keeada's house. A.T. remembered someone taking her

outside, where she passed out on the lawn. She could not walk on her own. She remembered falling asleep on the lawn and then seeing her mother arrive. A.T.'s mother and her stepfather picked her up and placed her in their car, and her mother called the police. A.T. stated that she was not able to get up off the ground herself, nor was she able to talk. The police arrived, and A.T.'s mother spoke with the police.

{¶26} The next morning, A.T. explained to her parents what happened the previous night. A.T. testified that she told her mother that Shivers worked at Pizza Hut. Her mother then "took the initiative and searched down every Pizza Hut that was close to us and that's how she found Mr. Shivers." A.T. stated that her parents confronted Shivers and they drove to the police department and filed a report. Thereafter, A.T. went to the hospital, where a SANE nurse examined her.

{¶27} A.T.'s mother ("Mother") testified that one evening in May 2013, she received a call from A.T.'s boyfriend, who expressed concern because he could not understand what A.T. had been saying over the phone. She was incoherent. Mother went to Tyler's place, knowing that A.T. was supposed to be with Tyler. When she arrived, she spoke with Tyler's mother, who then called Tyler to inquire about A.T.'s whereabouts. Mother learned that A.T. was in the area of E. 222nd Street. Mother then drove to that location and found A.T. on a tree lawn, alone and crying. Mother testified that she smelled alcohol and she could not understand what A.T. was saying. Mother's boyfriend picked A.T. up, carried her "like a baby" to the car, and he placed her in the back seat of the car.[1] Mother stated that A.T. was limp and could not walk on

---

[1] Mother refers to this gentleman as her "ex-boyfriend" and her boyfriend. A.T. identified the individual who helped her into the car as her stepfather.

her own. She did not remember who phoned the police, but at some point, the police arrived. After speaking with a police officer, Mother took A.T. home.

{¶28} Mother learned the following morning what happened to A.T. After speaking with A.T., Mother drove to area Pizza Huts, looking for Shivers. Mother testified that she wanted to confront Shivers because she believed he gave her underage daughter alcohol and because A.T. "felt like someone touched her." When she found Shivers, she confronted him, and she told the manager to phone the police. Mother testified that Shivers apologized to her. She then drove A.T. to the police station to file a report. Mother stated that both she and A.T. met with the police and, thereafter, she drove A.T. to the hospital for an examination.

{¶29} A.T.'s friend, Tyler, had known A.T. from school since 2010 or 2011, but they became friends beginning in 2012. They typically hung out at A.T.'s mother's place, playing computer games. Tyler stated that in 2013, she had been acquaintances with Shivers, having met at Pizza Hut. She had previously hung out with Shivers, along with Keeada, but never A.T.

{¶30} Tyler testified that in May 2013, Shivers picked her, A.T., and Keeada up and drove the girls back to his apartment. Tyler stated that A.T. was a loner, not talkative, and she did not previously drink alcohol. When they arrived at Shivers's apartment, Tyler remembered there being a lot of alcohol, including "vodkas, tequilas, and whiskeys." Tyler testified that all three girls were drinking alcohol that night, and she could tell that A.T. was becoming intoxicated. She stated that A.T. was "slurring her words * * * acting weird * * * jut totally completely not herself." She continued, "I just told you she was [a quiet person]. She wasn't quiet. She was walking around. She was just totally, completely opposite of who she is."

{¶31} Tyler testified that she remembered at some point toward the end of the evening, she saw A.T. going into the bedroom, and then she saw Shivers come from the bedroom, and he

told Tyler that she needed to "go in the back room and get my friend." When Tyler went into the bedroom, she saw A.T. lying on her back "spread eagle" on the bed "with her panties on and her shirt up and she was saying [Shivers] raped her." Tyler described finding A.T. "a wreck * * * terrified * * * almost like traumatized." Tyler further testified that one could definitely tell A.T. was drunk and she was "freaking out."

{¶32} After A.T. indicated that she was raped, Tyler confronted everyone in the apartment about what happened. No one answered her. Tyler stated that she and Keeada had to physically dress A.T. At that point, she and the other girls began receiving phone calls from their mothers. Tyler explained that she answered A.T.'s phone "because [A.T.] was so drunk she couldn't answer the phone." Tyler testified that A.T.'s mother instructed Tyler to have A.T. waiting outside Keeada's house after the girls were dropped off.

{¶33} Keeada was acquainted with A.T. through Tyler. Keeada also knew Shivers through Tyler. Keeada testified that every time she and Tyler hung out with Shivers, they would drink. Before May 2013, A.T. never hung out with Keeada, Tyler, and Shivers.

{¶34} Keeada testified that on that evening in May 2013, all three girls were drinking. Specifically, she remembered them "taking shots." Keeada stated that A.T. was not dancing with the others; rather, she was "chilling" and on the phone. According to Keeada, A.T. was not talking to Shivers during the night.

{¶35} At some point, Keeada noticed that A.T. was not around, stating she "disappeared for a while." Keeada went looking for A.T. in the apartment. She discovered her in the back bedroom with Shivers. She saw A.T. on the bed with her pants unbuckled and unzipped, and Shivers was standing up with his pants unbuckled as well. A.T.'s testimony identified a skirt, rather than pants, being pulled down or off. Keeada told A.T. that they should go, and she

began to tug on A.T., but A.T. would not get up. So Keeada went back into the living room to get Tyler's help. When Keeada returned to the bedroom with Tyler, Keeada recalled that A.T. was "hanging halfway off the bed," her pants were completely off, and her panties were at her knees. Keeada stated that Shivers's pants were off as well. When Keeada and Tyler tried to get A.T. off the bed, she began to cry "hysterically." A.T. indicated that Shivers raped her.

{¶36} Keeada testified that she and Tyler dressed A.T., and Shivers drove them back to Keeada's place. Keeada stated that A.T. was vomiting on the car ride home and she was unsteady on her feet. After they arrived at Keeada's place, Tyler walked A.T. outside to meet her mother.

{¶37} Officer Maslyk responded to a call from dispatch in the early morning hours in May 2013 concerning an intoxicated juvenile in the area of E. 222nd Street. Officer Maslyk identified A.T.'s mother as the individual who called the police, reporting that Mother had discovered her daughter lying in the front yard, heavily intoxicated. The officer recommended that Mother take A.T. to the hospital. He also offered to call an ambulance to the scene to have A.T. evaluated due to her level of intoxication. Officer Maslyk stated that "someone who's extremely impaired, who's lying in the front yard, who is slurring their words, who can't even give a simple sentence, generally, we want them checked out by an EMS or taken to the hospital to get them evaluated." The officer testified that A.T. was exhibiting these symptoms. He further stated that A.T. was mumbling the same words. A.T.'s mother, however, decided to bring A.T. home, and Officer Maslyk's involvement with A.T. and her mother ended.

{¶38} Corporal Leskovec testified that he was involved in the investigation of a complaint filed by A.T. in May 2013, which was similar in nature as the complaint filed by A.C. in January and likewise implicated Shivers. Corporal Leskovec received the initial report and

met with A.T., Mother, and Mother's boyfriend. He obtained a statement from A.T., forwarded the information to Detective Oberdoester, and called Shivers back into the police station for an interview regarding A.T.'s complaint.

{¶39} Detective Oberdoester testified that approximately four months after receiving A.C.'s complaint of a sexual assault, the department received a second complaint concerning Shivers. The second alleged victim was A.T. After reviewing Corporal Leskovec's report concerning A.T.'s complaint, Detective Oberdoester learned that the alleged rape occurred at the same location stated in A.C.'s complaint. The detective then interviewed A.T., Mother, and Tyler. Thereafter, Detective Oberdoester attempted once again to locate A.C. This attempt was successful, and charges were filed in both cases.

## IV. Sufficiency of the Evidence

{¶40} In his fourth assignment of error, Shivers contends that the trial court erred in denying his Crim.R. 29 motion for acquittal because his conviction for rape in violation of R.C. 2907.02(A)(1)(c) is not supported by sufficient evidence. Shivers argues that the state failed to show that the victim, A.T., was substantially impaired and that he knew or should have known that she was substantially impaired.

{¶41} A Crim.R. 29 motion challenges the sufficiency of the evidence. When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court

is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶42} R.C. 2907.02(A)(1)(c) provides that "no person shall engage in sexual conduct with another * * * when [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *."

{¶43} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Whether a person acted "knowingly" is inferred from the totality of the circumstances surrounding the alleged offense. *State v. Jones*, 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, ¶ 42, citing *State v. Booth*, 133 Ohio App.3d 555, 562, 729 N.E.2d 406 (10th Dist.1999).

{¶44} The Ohio Supreme Court has determined that the phrase "substantial impairment" must be given the meaning understood by its common usage, as the phrase is not defined in the Ohio Criminal Code. *State v. Zeh*, 31 Ohio St.3d 99, 103, 509 N.E.2d 414 (1987). "[S]ubstantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." *Id.* at 103-104.

{¶45} This court has repeatedly found that voluntary intoxication is a mental or physical condition that could cause substantial impairment. *State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, ¶ 24; *Jones* at ¶ 43, citing *State v. Doss*, 8th Dist. Cuyahoga No.

88443, 2008-Ohio-449, ¶ 13; *In re King*, 8th Dist. Cuyahoga Nos. 79830 and 79755, 2002-Ohio-2313, ¶ 22. And in Ohio, sexual conduct with an intoxicated person "becomes criminal when the victim's 'ability to resist or consent is substantially impaired by reason of voluntary intoxication.'" *Jones* at ¶ 43, quoting *In re King* at ¶ 22. This substantial impairment may be shown by the testimony of those who have interacted with the victim. *State v. Brady*, 8th Dist. Cuyahoga No. 87854, 2007-Ohio-1453, ¶ 78.

{¶46} This court has also held that sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct. *Keller* at ¶ 25; *State v. McCall*, 8th Dist. Cuyahoga No. 104479, 2017-Ohio-296, ¶ 6, citing *State v. Jones*, 8th Dist. Cuyahoga No. 98151, 2012-Ohio-5737, ¶ 30, citing *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 21 (when a person is asleep, he or she is not in a mental condition to resist or consent to the sexual conduct).

{¶47} Moreover, the element regarding whether an offender knew or had reasonable cause to believe a victim was impaired may be reasonably inferred from a combination of the victim's demeanor and others' interactions with the victim. *Jones*, 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, at ¶ 43, citing *State v. Novak*, 11th Dist. Lake No. 2003-L-077, 2005-Ohio-563, ¶ 25.

{¶48} Here, A.T. testified that she had never drank alcohol before the night of the party in May 2013; however, that evening at the party in Shivers's apartment, where Shivers, Shivers's friends, and A.T.'s friends were also present, A.T. consumed two double shots of tequila and one Jello shot. A.T. stated that she did not feel "normal" after drinking, and she remembered feeling "really drunk." Shivers picked A.T. up off the living room couch and carried her to the bedroom, where Shivers repeatedly pulled A.T.'s skirt down. She testified that she continued to

pull her skirt back up and she told Shivers "no," but Shivers continued. According to A.T., at some point, Keeada entered the bedroom, Shivers walked out, and A.T. "passed out on the bed and fell asleep." A.T. testified that she next remembered seeing a flash of light that awakened her to Shivers pulling her skirt down again. A.T. stated that she was physically unable to push Shivers off of her and he proceeded to have sex with her, despite A.T. telling him to stop. A.T. further testified that she tried to tell Tyler who had raped her, but she had difficulty "using her words."

{¶49} Keeada testified that A.T. was doing shots of alcohol. She further testified that when she walked into the back bedroom later in the evening, she discovered A.T. lying on the bed and Shivers standing nearby, both of whom had their pants unbuckled and unzipped. When Keeada tugged on A.T., she would not get up. Keeada testified that she enlisted Tyler's help in removing A.T., and when the girls returned to the bedroom, she found A.T. "hanging halfway off the bed," with her pants off and her panties at her knees. She stated that Shivers was there and his pants were completely off as well. Keeada testified that A.T. began crying hysterically. Both Keeada and Tyler testified that they had to dress A.T. because she could not do it herself. Keeada observed that A.T. vomited on the way home and she was unsteady on her feet. Keeada testified that Shivers drove the girls home.

{¶50} Tyler testified that she knew A.T. did not drink. She also knew A.T. to be a loner and not very talkative; however, that evening, she remembered that A.T. was drinking and becoming intoxicated. Tyler testified that A.T. was not her usual quiet self; rather, she was slurring words, "acting weird," "completely the opposite of who she is," walking around and talking. Tyler stated that at some point in the evening, she saw A.T. enter the bedroom and then Shivers walk out of the bedroom. Upon leaving the bedroom, Shivers told Tyler to "get [her]

friend." When she entered the bedroom, she found A.T. "spread eagle" on the bed, lying on her back. Her panties were on and her shirt was up. Tyler described A.T. at this point as a "wreck" and "traumatized," and "freaking out." Tyler testified that one could definitely tell A.T. was drunk. Finally, Tyler stated that she had to answer A.T.'s phone when A.T.'s mother called because A.T. was too drunk to answer the phone.

{¶51} A.T.'s mother testified that she found A.T. lying on a tree lawn, alone and crying. A.T.'s mother stated that she smelled alcohol and she could not understand anything A.T. was saying. Mother stated that A.T. was limp, she could not walk on her own, and someone had to carry A.T. to Mother's car. Officer Maslyk responded to a call from dispatch concerning an intoxicated juvenile. The officer testified that when he arrived on the scene, he found A.T. to be heavily intoxicated, and he recommended that Mother take A.T. to the hospital or call an ambulance for an evaluation.

{¶52} The testimony outlined above demonstrates that A.T. was extremely intoxicated, as evidenced by her inability to speak clearly, walk, and dress herself, and this intoxication was evident to all who encountered A.T. that evening. The evidence further shows that Shivers was in A.T.'s vicinity the entire evening, up to and including when he drove A.T. home. We therefore find the state presented sufficient evidence to establish that A.T. was substantially impaired and that Shivers knew or should have known that she was substantially impaired, thus supporting Shivers's conviction for rape in violation of R.C. 2907.02(A)(1)(c).

{¶53} Shivers's fourth assignment of error is overruled.

## V. Prosecutorial Misconduct

{¶54} In his first assignment of error, Shivers contends that the prosecutor engaged in misconduct during closing arguments of the first trial, where the jury convicted Shivers of the

substantial impairment rape of A.T. Shivers argues that the prosecutor improperly commented on Shivers's right not to testify.

{¶55} During the state's closing argument, the prosecutor stated:

[Defendant] wants to belittle Keeada, Tyler, and A.T., who were at the party. I think Tyler said it best when she took the witness stand and testified, I'm there because he invited me. He's serving — shake your head no. Now is not the time.

The court sustained defense counsel's objection, and the prosecutor continued with closing argument. After closing, however, defense counsel addressed the prosecutor's comment:

Your Honor, there was one thing. And I didn't know the timing because I didn't want to break the flow of it. But you know, there was a comment made by the state with regard to Shivers's silence when he referenced them saying no.

Now, I think that was an improper argument made by the prosecutor on that. And we're requesting that the court give the curative instruction asking that any reference to Mr. Shivers's right to remain silent should not be considered in any way for any purpose.

{¶56} The prosecutor then explained to the court that he was not commenting on his right to remain silent; rather, he commented on Shivers's gesture: "I never talked about him not testifying. But * * * if he has mannerisms and expressions and makes motions in front of the jury, then I can comment on that." The court concluded that the circumstances did not warrant a curative instruction and denied defense counsel's request, noting that the court sustained the objection and it previously instructed the jury regarding the defendant not testifying. In response, defense counsel said, "Okay."

**{¶57}** In reviewing a claim of prosecutorial misconduct, we must determine whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶58}** Generally, a prosecutor is entitled to wide latitude during closing argument. *State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 84 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). And the closing argument must be viewed in its entirety to determine whether the disputed remarks were prejudicial. "[I]isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Gapen* at ¶ 106, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In determining whether a prosecutor's comment was prejudicial, we consider several factors: (1) the nature of the remark(s); (2) whether an objection was made by counsel; (3) whether the court gave curative instructions; and (4) the general strength of the evidence against the defendant. *Harris*, citing *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

**{¶59}** It is well settled, however, that a prosecutor may not comment on a defendant's failure to testify. *State v. Valentine*, 8th Dist. Cuyahoga No. 94355, 2011-Ohio-184, ¶ 16, citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Lynn*, 5 Ohio

St.2d 106, 214 N.E.2d 226 (1966), paragraph one of the syllabus. In determining whether a defendant's Fifth Amendment rights were violated, we consider "'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *State v. Webb*, 70 Ohio St.3d 325, 328, 638 N.E.2d 1023 (1994), quoting *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir.1955); *Ladson* at ¶ 34.

{¶60} Nevertheless, even if the prosecutor improperly commented on an accused's right to silence, the prosecutor's comments do not require automatic reversal of the conviction. *State v. York*, 8th Dist. Cuyahoga No. 87814, 2006-Ohio-6934, ¶ 29, citing *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Zimmerman*, 18 Ohio St.3d 43, 44-45, 479 N.E.2d 862 (1985). "A constitutional error is harmless beyond a reasonable doubt 'if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt.'" *York* at ¶ 29, quoting *State v. Williams*, 38 Ohio St.3d 346, 349, 528 N.E.2d 910 (1988).

{¶61} Here, the prosecutor was in the middle of closing argument, discussing Tyler's testimony, when he observed Shivers shaking his head. The prosecutor, noticing Shivers's movement, made a brief comment on Shivers's gesturing in front of the jury and then continued with his argument. A prosecutor may comment on a defendant's demeanor, body language, or lack of concern during trial. *State v. Green*, 90 Ohio St.3d 352, 373, 2000-Ohio-182, 738 N.E.2d 1208; *State v. Ladson*, 8th Dist. Cuyahoga No. 105914, 2018-Ohio-1299, ¶ 38 (finding prosecutor's reference to the accused's "stone-faced" reaction to emotional evidence presented during trial not infringing on the accused's right to remain silent); *see, e.g., State v. Bey*, 85 Ohio St.3d 487, 496-497, 1999-Ohio-283, 709 N.E.2d 484 (state can comment on accused's emotional

outburst during argument); *State v. Hill*, 75 Ohio St.3d 195, 203, 661 N.E.2d 1068 (1996) (stating that the prosecutor "could legitimately point out that [the accused] did not react when scenes of his dead child were shown"); *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538 (1988) (state may comment on the accused's appearance as "a defendant's face and body are physical evidence"). And at no point during closing argument did the prosecutor explicitly state that Shivers chose not to testify, nor did he otherwise address Shivers's right to remain silent.

{¶62} When this sole comment is placed in the context of the prosecutor's overall closing argument, we cannot find that the comment was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Webb*, 70 Ohio St.3d 325, 328, 638 N.E.2d 1023. Moreover, the prosecutor's isolated comment cannot be taken out of context and given its most damaging meaning. *Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047.

{¶63} However, even if we find the prosecutor's comment improper, we cannot find that this isolated comment prejudiced the defendant in light of the overwhelming evidence of his guilt, as more fully discussed in the previous assignment of error. The victim herself testified that she drank two double shots of tequila and a Jello shot that evening and she was "really drunk." She had difficulty talking, walking, and staying awake. According to her friends, Tyler and Keeada, she could not get up off of the bed without assistance and she could not dress herself. A.T. testified that at some point she awakened on the bed to find Shivers on top of her, having sex with her. As reported by A.T.'s mother, her daughter smelled of alcohol and she was incoherent. And the responding police officer reported that A.T. was highly intoxicated and should be medically evaluated.

**{¶64}** Moreover, the evidence demonstrated that Shivers was either with A.T. in the bedroom or in the apartment living room the entire evening, readily observing A.T.'s drunkenness. The victim, Tyler, and Keeada, all testified that Shivers was in the bedroom with A.T. when she was passed out on the bed, when Keeada tried to pull A.T. off the bed, and when A.T. was "freaking out" or crying hysterically. And Tyler testified that after Shivers left A.T. in the bedroom, telling Tyler to retrieve her friend, Tyler found A.T. "a wreck," stating one could definitely tell that A.T. was drunk. Finally, the evidence shows that A.T. vomited on the ride home and that Shivers drove all of the girls home.

**{¶65}** Furthermore, the trial court sustained defense counsel's objection to the prosecutor's comment, and immediately preceding the state's closing argument, the trial court instructed the jury that closing arguments are not evidence and the jury should not speculate as to why the court sustained an objection. The trial court also advised the jury that the defendant has a constitutional right not to testify and the fact that he did not testify must not be considered by the jury for any purposes. These jury instructions limited the potential for prejudice from any misconduct. *State v. Sanders*, 8th Dist. Cuyahoga No. 106744, 2018-Ohio-4603, ¶ 26, citing *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 250, 253. And we presume the jury follows the court's instructions. *Harris*, 2017-Ohio-2751, 90 N.E.3d 342, at ¶ 87.

**{¶66}** We therefore find, in light of the overwhelming evidence that A.T. was extremely intoxicated, her intoxication was obvious to all those who encountered A.T., and Shivers was aware of A.T.'s condition, that the outcome of the trial would have been the same even had the prosecutor refrained from commenting on Shivers's gesture during closing argument. Thus, the prosecutor's comment did not "permeate the atmosphere of the whole trial" such that it

substantively deprived Shivers of a fair trial. *Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, at ¶ 99.

{¶67} Shivers's first assignment of error is overruled.

VI. Motion for a Mistrial

{¶68} In his second assignment of error, Shivers contends that the trial court erred when it denied his motion for a mistrial based upon the state's alleged discovery violation during the first trial.

{¶69} The decision whether to grant or deny a motion for mistrial lies within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). A mistrial should not be ordered in a criminal case "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Rather, a mistrial is declared "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

{¶70} Here, the state did not disclose to the defense the victim, A.C.'s, written statement prior to trial. Shivers argues that this discovery violation unfairly prejudiced him and therefore warranted a mistrial.

{¶71} Crim.R. 16, which governs discovery in a criminal case, provides that the purpose of the discovery rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the judicial system and the

rights of defendants, and to protect the well-being of witnesses, victims, and society at large."
Crim.R. 16(A). The rule serves "'to prevent surprise and the secreting of evidence favorable to one party.'" *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). And pursuant to Crim.R. 16(B)(7), the prosecutor must provide the defense "[a]ny written or recorded statement by a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal."

**{¶72}** A trial court has broad discretion in regulating discovery and in determining a sanction for a discovery violation. *Darmond* at ¶ 33. When imposing a sanction, however, the trial court must inquire into the circumstances and impose the least severe sanction that is consistent with the purpose of the rules of discovery. *Papadelis* at paragraph two of the syllabus; *State v. Rucker*, 8th Dist. Cuyahoga No. 105628, 2018-Ohio-1832, ¶ 20.

**{¶73}** In determining the appropriate sanction, a trial court must consider the following three factors: (1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have benefitted the accused in the preparation of a defense; and (3) whether the accused was prejudiced. *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus.

**{¶74}** During cross-examination of A.C., defense counsel learned that A.C. made a written statement during her interview with the Mayfield Heights police department. Prior to the conclusion of A.C.'s cross-examination, the court briefly recessed. Upon returning, defense counsel completed A.C.'s cross-examination, and the state presented three more witnesses for examination. At the conclusion of the second witness's testimony, defense counsel requested a

side bar concerning an issue. After briefly conferring with the court, defense counsel agreed to wait until the afternoon recess to address his issue.

{¶75} During the afternoon recess, defense counsel advised the court that he had not received a copy of A.C.'s written statement prior to trial and, in fact, he did not receive a copy of this statement until after A.C.'s cross-examination. Counsel asserted that Shivers had therefore been prejudiced and moved for a mistrial. During this discourse, however, counsel conceded that he did not believe the state purposefully withheld the statement; nonetheless, the state, counsel argued, received a "tactical advantage" as a result.

{¶76} The prosecutor responded that the state's failure to disclose the statement was inadvertent, as he was unaware the statement existed. He explained that when A.C. began discussing a statement and the prosecutor "became aware that one might exist," he made efforts to retrieve the statement from the police department's property room, he obtained the statement, and he turned the statement over to the defense while A.C. was still on the witness stand. The prosecutor asserted that the defense therefore had an opportunity to review the report for any inconsistencies and use the statement to impeach A.C., if desired. The prosecutor also suggested that at the very least, defense counsel had an opportunity to address this issue with the court while A.C. was still on the witness stand but neglected to do so.

{¶77} The court reviewed the timing of the events. Defense counsel conceded that he had received A.C.'s statement during redirect examination and could have "theoretically" conducted a recross-examination of A.C. The court then reviewed A.C.'s statement and determined that a mistrial was not warranted, finding that "with exception of her testimony about * * * him trying to get her to touch his penis" it found no inconsistencies. The court nonetheless offered to bring A.C. back to the witness stand for defense counsel's questioning

concerning this issue, and it offered the defense counsel an opportunity to otherwise make a record. In denying counsel's motion for a mistrial, the court stated:

> I don't believe an instruction to the extent of discounting her testimony is appropriate. And, again, you had full opportunity to cross-examine her regarding her in-court statements. I presume you had the benefit of the reiteration of whatever her statement was in the police report. Maybe not. And so I'm going to deny your motion for mistrial at this point.

{¶78} The prosecutor suggested defense counsel proffer how the defense would have used the statement during A.C.'s cross-examination and how the defense was prejudiced. Defense counsel, however, declined, stating that "the situation is just plain and clear" and the state violated "the spirit of the rule" to timely produce documents. In response, the court stated:

> [Q]uite frankly, if you've read [the statement], there really is nothing in there. It's a one-page statement * * *. [A]nd the only thing in here that indicates anything contrary to what she testified to is about the attempt to have * * * her touch his penis.

{¶79} The court then inquired whether defense counsel had any additional comments for the record, and he replied that he did not.

{¶80} In light of the foregoing, we find the trial court did not err in denying the defendant's motion for a mistrial. We note initially that defense counsel conceded that the failure to disclose the victim's statement was not a willful violation of Crim.R. 16. Additionally, the trial court conducted a thorough inquiry into the circumstances, including the timing of the disclosure and whether the defendant suffered prejudice. In so doing, the court reviewed the one-page statement and determined that the statement did not contain material inconsistencies. Nonetheless, the court offered to recall the victim in order for the defense to continue its cross-examination, which is a less drastic sanction for discovery violations permitted

under Crim.R. 16(E)(3). *See State v. Collins*, 8th Dist. Cuyahoga No. 89668, 2008-Ohio-2363, ¶ 38, citing *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990); Crim.R. 16(E)(3) (providing the court the power to "make such order as it deems just" when a party has failed to comply with discovery).

{¶81} Accordingly, we find the trial court's actions were sufficient under the circumstances to ensure Shivers received a fair trial.

{¶82} Shivers's second assignment of error is overruled.

VII. Joinder

{¶83} In his third assignment of error, Shivers contends that the trial court erred when it denied his motion to sever the charges pertaining to the two victims.

{¶84} Crim.R. 8(A) governs the joinder of offenses in a single indictment. Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶85} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565. "[J]oinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries." *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). *See also State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990); *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

**{¶86}** Under Crim.R. 14, however, the trial court may grant a severance, if it appears that the defendant would be prejudiced by the joinder. The defendant bears the burden of proving prejudice. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

**{¶87}** There are two methods by which the state may refute the defendant's claim of prejudicial joinder: (1) by showing that, if in separate trials, the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B) (referred to as the "other acts" test); or (2) by showing that the evidence of each crime joined at trial is "simple and direct." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). "Simple and direct" evidence means the evidence of each crime is "so clearly separate and distinct as to prevent the jury from considering evidence of [one crime] as corroborative as the other." *State v. Quinones*, 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576, ¶ 48. *See also State v. Varney*, 4th Dist. Hocking No. 07CA18/07AP18, 2008-Ohio-5283. This court has held that evidence of multiple offenses is simple and direct where the offenses involved different victims, different incidents or factual scenarios, and different witnesses. *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 88 (8th Dist.).

**{¶88}** "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *Torres*, 66 Ohio St.2d at 343-344, 421 N.E.2d 1288. Joinder is therefore not prejudicial when the evidence is direct and uncomplicated and can reasonably be separated as to each offense, regardless of the inadmissibility of evidence of these crimes as "other acts" under Evid.R. 404(B). *Id.* Thus, if the state can meet the requirements of the "joinder test," it need not meet the requirements of the stricter "other acts" test. *Franklin*, 62 Ohio St.3d at 122, 580 N.E.2d 1.

**{¶89}** Generally, we review a trial court's decision regarding joinder for an abuse of discretion. *State v. Banks*, 2015-Ohio-5413, 56 N.E.3d 289, ¶ 64 (8th Dist.). Where a defendant fails to renew a motion to sever at the close of the state's case or the close of all evidence, however, he waives all but plain error on appeal. *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101019, 2015-Ohio-2512, ¶ 32, citing *State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 82. Plain error is "an obvious error or defect in the trial court proceeding that affects a substantial right." *State v. Gray*, 8th Dist. Cuyahoga No. 92303, 2010-Ohio-240, ¶ 17, citing *State v. Long*, 53 Ohio St.2d 91, 94, 372 N.E.2d 804 (1978). We take notice of plain error only in exceptional circumstances to avoid a miscarriage of justice. *Long* at 95. Further, the party asserting the error bears the burden of demonstrating plain error. *State v. Crawford*, 2016-Ohio-7779, 73 N.E.3d 1110, ¶ 13 (8th Dist.). We note that the record does not indicate that Shivers renewed his motion to sever at the close of the state's case or the close of all the evidence. He therefore waives all but plain error.

**{¶90}** Shivers contends that the court's joinder of the offenses prejudiced him. In support, he states that joinder allowed the jury to make improper inferences based solely on the fact that he was tried together for two separate, dissimilar offenses. However, he provides no specific examples that demonstrate the jury was confused or that the jury considered evidence of one crime as corroborative of the other.

**{¶91}** Here, the crimes against the two young females involved rape. The evidence relating to each incident was simple and direct: the incidents occurred on separate dates, they involved separate victims, and the state presented different witnesses to support the charges in each incident. Moreover, the trial court advised the jury that "each count in the indictment constitute[s] a separate and distinct matter," and it instructed the jury to "consider each count and

the evidence applicable to each count separately" and "state your findings as to each count uninfluenced by your verdict as to the other count or counts." We presume a jury follows the court's instructions. *Harris*, 2017-Ohio-2751, 90 N.E.3d 342, at ¶ 8.

{¶92} In addition, there is nothing in the record that suggests the jury factored the evidence from the incident involving A.C. to determine Shivers's guilt in the incident involving A.T., or vice versa, or that the jury was confused or was "improperly influenced by the cumulative effect of the joinder." *Banks,* 2015-Ohio-5413, 56 N.E.3d 289*,* at ¶ 66. On the contrary, the record demonstrates that the jury considered each offense separately, finding Shivers guilty of the substantial impairment rape of A.T. while acquitting him of the gross sexual imposition of A.C. by force or threat of force. He therefore cannot show he was prejudiced by the court's refusal to sever the offenses. *Id.* at ¶ 68.

{¶93} Shivers's third assignment of error is overruled.

### VIII. Jury Polling

{¶94} In his fifth assignment of error, Shivers contends that the trial court erred when it accepted the jury's verdict. Specifically, he argues that Juror No. 1 did not definitively assent to her verdict when she indicated the amount of pressure in the jury room. Shivers also argues that Juror No. 4 did not affirm her verdict and the court's failure to require the jury to continue deliberations violated R.C. 2945.77.

{¶95} We review a trial court's acceptance of a jury's verdict for an abuse of discretion. *State v. Goodwin*, 8th Dist. Cuyahoga No. 99254, 2013-Ohio-4591, ¶ 45, citing *State v. Brumback*, 109 Ohio App.3d 65, 73, 671 N.E.2d 1064 (9th Dist.1996). We therefore will not reverse the trial court's ruling unless the court's decision was "unreasonable, arbitrary, or unconscionable." *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994).

**{¶96}** The purpose of the jury poll is to

"give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented."

*State v. Hessler*, 90 Ohio St.3d 108, 121, 734 N.E.2d 1237 (2000), quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958).

**{¶97}** R.C. 2945.77 and Crim.R. 31(D) provide for the polling of the jury to determine whether there is a unanimous verdict. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 41. R.C. 2945.77 provides that "[i]f one of the jurors being polled declares that said verdict is not his verdict, the jury must further deliberate upon the case." This statute requires the jury to further deliberate if a juror contradicts his or her own verdict. *Goodwin* at ¶ 46. Similarly, Crim.R. 31(D) permits a trial court to either direct further deliberations or discharge the jury "[i]f upon the poll there is not unanimous concurrence." "'Both the statute and the rule preclude acceptance of the verdict only if the jury members are not in agreement on the determination of guilt.'" *State v. Garner*, 11th Dist. Lake No. 2007-L-041, 2007-Ohio-5914, ¶ 63, quoting *Brumback* at 73.

**{¶98}** Here, the verdict was returned and at the defense's request, the court polled the jurors. During polling, the following exchange occurred:

Court: Ma'am, are these verdicts your individual verdicts?

Juror No. 1: Yes.

\* \* \*

Juror No. 4:     Me?

Court:           Yes, Ma'am.   Are the ones which I've read that have been filled out, the Count 1, Count 2, Count 3, and Count 6.

Juror No. 4:     You said we have to have a yes or no answer?   What did you say about comments to it?

Court:           Did you have a comment that you wanted to —

Juror No. 4:     Yeah.   According to the letter of the law and the understanding that was provided, then on Count 2 I had to vote not guilty. But I was not in agreement with the letter of the law. But I don't know if I have that right.

Juror No. 1:     There was a lot of pressure going on.

Court:           I imagine so.   But hold on.   Because Count 2 is a charge of rape and the verdict is for guilty.

Juror No. 4:     Right.

Court:           So is this verdict in Count 2 not your individual verdict?

Juror No. 4:     I — according to the understanding that they made — that I had to abide by the letter of the law, it was kind of forced.

Court:           Well, again, I —

Juror No. 4:     So you asked me if we had a yes or no or a comment.   So I'm saying it's my verdict.   But if I have a comment based on the information and instructions I was given, there was really no choice * * * according to the letter of the law.

Court:           So am I to understand you're saying that in following the instructions as I gave them to you and applying those to the evidence that you determined, this was your verdict? * * *

Juror No. 4:     It was not determined by the evidence.   It was determined by the law.

Court:           But in following the law —

Juror No. 4:     So — okay. Then yes.

{¶99} The above exchange demonstrates that the court endeavored to ensure that Juror No. 4's verdict was "guilty" and it showed that Juror No. 4 assented to the verdict. In providing additional commentary, the juror stated that, although she disagreed with the law and she felt compelled by "the letter of the law" to return a guilty verdict in Count 2, she did, in fact, follow the law in finding Shivers guilty in Count 2.

{¶100} Furthermore, although Juror No. 1 commented about "a lot of pressure" in the jury room, Shivers did not present any evidence that Juror No. 1 was pressured or intimidated into changing her opinion or that her decision was not of her own free will. On the contrary, the record shows that when asked by the court whether the verdicts are her individual verdicts, Juror No. 1 clearly replied, "Yes," without any noted hesitation or commentary. Moreover, there was no evidence presented of explicit or implicit coercive pressure that caused any of the jurors "to surrender their independent judgment and vote to find the defendant guilty." *State v. Cogdill*, 10th Dist. Franklin No. 91AP-1092, 1992 Ohio App. LEXIS 3654, 10 (July 9, 1992); *Hessler*, 90 Ohio St.3d at 120, 2000-Ohio-30, 734 N.E.2d 1237 (finding "heightened emotions and intense feelings," "heavy-handed influencing and browbeating" a typical part of deliberations process).

{¶101} In light of the foregoing, we find the trial court did not abuse its discretion in not sending the jury back for further deliberations.

{¶102} Shivers's fifth assignment of error is overruled.

IX. Prior Testimony

{¶103} In his sixth and final assignment of error, Shivers contends that the trial court erred when it permitted the state to admit the transcript of A.C.'s testimony from the first trial into evidence in the second trial. Shivers argues that A.C.'s former testimony was not

admissible under Evid.R. 804 because the witness was available and had already testified at trial. He argues, therefore, that her testimony was hearsay.

{¶104} We review a trial court's evidentiary rulings at trial for an abuse of discretion. *State v. Williams*, 8th Dist. Cuyahoga No. 106266, 2018-Ohio-3368, ¶ 42.

> "Where, on cross-examination, a witness is impeached by a showing of prior statements made by him in a written instrument apparently inconsistent with his statements on direct examination, reference to other statements in the same document used to impeach him is proper for the purpose of rehabilitation, where such other statements are consistent with the statements made on direct examination or are in explanation of such apparent inconsistency and do not serve to inject new issues into the case."

*State v. Rodriguez*, 8th Dist. Cuyahoga No. 101971, 2015-Ohio-3875, ¶ 52, quoting *Shellock v. Klempay*, 167 Ohio St. 279, 148 N.E.2d 57 (1958), paragraph two of the syllabus; *State v. Monroe*, 8th Dist. Cuyahoga No. 94768, 2011-Ohio-3045, ¶ 47; *State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, ¶ 47.

{¶105} Thus, when a portion of a prior statement is used to impeach a witness, "thereby showing an inconsistency with the current testimony, the entire document may be admitted on rebuttal, in order to rehabilitate the witness." *State v. Wilson*, 8th Dist. Cuyahoga No. 96380, 2012-Ohio-102, ¶ 40, citing *State v. Loper and Nash*, 8th Dist. Cuyahoga Nos. 81400, 81297, and 81878, 2003-Ohio-3213, ¶ 60. The other statements, however, cannot "serve to inject new issues into the case." *Shellock* at paragraph two of the syllabus.

{¶106} Here, during cross-examination of A.C. at the second trial, defense counsel used or referenced A.C.'s prior testimony from the first trial approximately 11 times in an effort to

impeach her testimony. At the close of the state's case, the state moved to admit the entire transcript of A.C.'s prior testimony, among other exhibits. Defense counsel offered a general objection, stating, "just note our objection with regard to the transcript." Defense counsel offered no explanation for his objection.

{¶107} Because, under the circumstances, an entire statement may be admitted in order to rehabilitate a witness, and defense counsel did not object to the transcript on the basis that it "injected new issues" into the case, we cannot find the trial court abused its discretion in allowing the entire transcript of A.C.'s prior testimony to be admitted.

{¶108} Shivers's sixth and final assignment of error is overruled.

{¶109} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

MELODY J. STEWART, J., CONCURS IN JUDGMENT ONLY;
MARY EILEEN KILBANE, P.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

MARY EILEEN KILBANE, P.J., DISSENTING:

{¶110} Respectfully, I would find that the prosecutor's comments during closing arguments constituted reversible error.

{¶111} The comments of the prosecutor with regard to the silence of the appellant were improper and prejudicial to the appellant in light of the evidence adduced by the state during the course of trial. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1995); *State v. Hedrick*, 8th Dist. Cuyahoga No. 57844, 1990 Ohio App. LEXIS 5647 (Dec. 20, 1990), *overruled in part on other grounds*, *State v. Jones,* 8th Dist. Cuyahoga No. 99703, 2014-Ohio-1634, ¶ 18. A new trial is warranted where the improper comments are considered within the context of the totality of the circumstances, which include hesitation by some jurors regarding their guilty verdicts.

{¶112} Accordingly, I would find the prosecutor's statements were improper comments on appellant's failure to testify in violation of his state and federal constitutional rights and require a new trial.