**The STATE of Ohio, Appellee,**

v.

**BOOTH, Appellant.**

[Cite as *State v. Booth* (1999), 133 Ohio App.3d 555.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 98AP–944.

Decided May 6, 1999.

*Ron O'Brien*, Franklin County Prosecuting Attorney, and *Amy H. Kulesa*, Assistant Prosecuting Attorney, for appellee.

*W. Joseph Edwards*, for appellant.

DESHLER, Judge.

This is an appeal by defendant, Charles Booth, Jr., from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which defendant was found guilty of felonious assault and carrying a concealed weapon.

In the early morning hours of August 2, 1997, Columbus Police Officer Paul J. Boldin was shot in the leg after responding to a report of a disturbance in a residential area on Delbert Road, Columbus. The defendant was taken into custody on that date. On August 12, 1997, defendant was indicted on one count of felonious assault, in violation of R.C. 2903.11, with a firearm specification, and one count of carrying a concealed weapon, in violation of R.C. 2923.12.

At trial, Officer Boldin gave the following account of the incident. On August 2, 1997, at approximately 3:30 a.m., Boldin responded to a dispatch indicating that a suspect with a gun had fired shots at a residence on the northeast side of Columbus. Another cruiser was also dispatched to the scene at that time.

Boldin was the first officer to arrive; he initially pulled up to the intersection of Delbert Road and Myrtle Avenue, parking approximately three houses from the reported address. The officer's intent was to wait for the other cruiser, and Boldin did not have his lights or siren in operation at the time he arrived. After

a few minutes, the officer heard "a commotion down at the end of the street." The noise sounded like a male voice shouting from the direction of a cul-de-sac, followed by the sound of two gunshots. The officer then observed an individual walking from the area of the cul-de-sac.

Officer Boldin communicated by radio that he had heard two shots. Boldin noticed neighbors coming out of their houses after the shots were fired. The officer became concerned for their safety, so he drove his cruiser to the cul-de-sac and put his spotlight on the suspect.

Officer Boldin ordered the suspect to get on the ground and to show both of his hands. The suspect refused. The man kept walking back and forth in front of the officer; the suspect was carrying what appeared to be a six-pack of beer, and he "seemed very agitated."

When Officer Boldin told the man to get on the ground and show his hands, the suspect shouted, "[F]uck you, go ahead and shoot me." Eventually, the suspect placed the beer on the ground and put his hands "at about a 45-degree angle from his body." Officer Boldin instructed the man to walk closer to the cruiser. When the man was approximately fifteen feet from the cruiser, Officer Boldin approached him. Boldin attempted to escort the suspect to the cruiser by grabbing the man's right hand in order to put it behind his (the suspect's) back. When the officer took the suspect's hand, the man pushed the officer away. Officer Boldin then took out a can of mace and sprayed the suspect in the eyes.

The suspect became more agitated and started running away from the officer. As the suspect was moving away, he reached into his pocket, and "turned back a little towards" Boldin. Officer Boldin then felt a pain in his right leg. The officer did not hear the first shot, but he heard another shot shortly thereafter. Officer Boldin, who had been hit by a bullet above the right knee, then pulled out his weapon and began firing at the suspect. The officer emptied his clip but the suspect ran away, heading north toward the end of the cul-de-sac. Boldin saw the man run between two houses before losing sight of him.

The second cruiser arrived at the scene shortly after the suspect fled. Other cruisers and medical personnel arrived shortly thereafter. Officer Boldin was transported to Grant Hospital where he was treated for the gunshot wound. At trial, Boldin identified the defendant as the individual who had shot him.

Geraldine Cook resides at 2458 Delbert Road. On August 2, 1997, at approximately 4:00 a.m., Cook was awakened by the sound of male voices shouting outside. Cook heard someone say, "[D]rop it." Cook went to her window and saw a police officer walking toward a black male. She heard the officer say a second time, "[D]rop it." The man refused to comply.

Eventually, the man put a can he had been holding down on the ground. The officer attempted to put the man's hands behind his back, and the black male said, "[Y]ou don't have to do this, it is just the two of us out here." The two men eventually walked out of Cook's sight. Cook then heard what sounded like a gunshot, and she screamed. She heard three or four more shots that were louder than the first. She then observed the black male "calmly walk between * * * two houses and went on." Cook then heard the officer call for help.

Nathan Spotts, who resides at 2443 Delbert Road, was watching television during the early morning hours of August 2, 1997. At approximately 3:00 a.m., he went out to his porch where he heard "some yelling." Spotts "looked over to Vonda Hargrove's house and a guy was yelling, talking about some money that she * * * owed him or something of that nature." Vonda Hargrove resides at 2456 Delbert Road. Spotts heard the man say that if he did not get paid by noon, he was "going to kill everybody."

Spotts observed the man continue to walk back and forth in front of Hargrove's house. The man "was hitting a car, and it sounded like a window busted." Spotts then heard "a couple of shots" from what sounded like a small revolver. After hearing a third shot, Spotts called the police.

Spotts eventually observed a police cruiser pull up to the area. The officer had a gun in his hand as he approached the man. Spotts saw the officer then put his gun away, and the officer and the other man started walking toward the cruiser. The officer asked the man on at least two occasions to drop an object on the ground. Eventually, the man complied. As the officer was holding the man's arm behind his back, the man pulled away. The officer then grabbed a can of mace and sprayed the suspect in the face.

Spotts then saw the defendant pull out a gun and shoot at the officer. The officer then shot three or four times at the defendant. After the shots were fired, the defendant went between a house and some shrubs.

Columbus Police Officer Larry Yates was one of the officers called to the crime scene that morning, following the shooting incident. Yates spoke with a witness, Vonda Hargrove, who provided him with the name of a male suspect, as well as two possible locations where he might be found. Yates and other officers went to a residence at 1872 Minnesota Avenue. A black female, Roberta Booth, answered the door.

Yates was engaged in a conversation with the woman, requesting her consent to search the house, when he heard someone say, "[F]uck it. Here I am." Yates saw the defendant standing in the living room. Yates and another officer, Sergeant Wilson, ordered the defendant to get on the ground. The defendant refused to comply. A struggle then ensued between the suspect and the officers.

Eventually, the officers were able to handcuff the defendant. Yates asked the defendant if he had any weapons on him. The defendant responded, "I don't have it. It's behind the couch."

A search warrant was then obtained for the residence. During the ensuing search, the officers found a .25 automatic handgun behind a couch. The officers also recovered some clothing matching the description of clothes reportedly worn by the suspect during the shooting incident.

Columbus Police Officer Scott Leroy transported the defendant to police headquarters after his arrest. The defendant stated at the time that he shot the officer because the officer maced him. The defendant asked the officers a number of times whether the wounded officer was "all right." Officer Leroy took notes during this time. At one point, the defendant stated, "He pulled his gun. I took three shots and he shot at me."

The state and defense counsel entered into a stipulation that Detective Russell Redman would have testified that he took notes on August 2, 1997 regarding an interview he conducted with Columbus Police Sergeant Brook Wilson. It was further stipulated that "although Detective Redman does not specifically recall the details of that interview, he did, in fact, take notes and upon checking those notes there is an indication that Sergeant Wilson did tell Detective Redman that the defendant had told him the officer shot at me first."

The defendant testified on his own behalf and gave the following account of the incident. The defendant resides at 2457 Cleveland Avenue. He and Vonda Hargrove have six children. On August 1,1997, the defendant purchased some beds for the children. Hargrove had just moved into a new house and the defendant told her that he would "help her get the boys a bed, and also buy her a refrigerator." The defendant "agreed to go half on the boys' beds, and I would get the refrigerator for her." According to the defendant, on the first of the month, Hargrove was "supposed to have brought me my half of the money back over for the beds." Hargrove never came to his house that day.

The defendant borrowed a friend's car and, at approximately 11:00 p.m., drove to Hargrove's residence at 2456 Delbert Road. Hargrove was not at home, so the defendant returned to his residence. The defendant drank "about maybe three or four beers" that evening.

The defendant later visited an acquaintance of both defendant and Vonda Hargrove. The friend told the defendant that Hargrove had just rented a new television and entertainment system. This information prompted the defendant to go to Hargrove's house and question her as to why she had not paid him the money she had promised.

The defendant began walking to Hargrove's house. He was carrying a handgun at the time. The defendant stopped at a United Dairy Farmers store and purchased a six-pack of beer. When the defendant arrived at Hargrove's house, he knocked on the door but nobody answered. The defendant sat in the driveway, "popped a beer and was sitting there yelling for her to come down." The defendant knocked on the door again and yelled at Hargrove to "come down and tell me anything about whether she was going to give me my money or what." The defendant became angry; he picked up a shovel and hit a car belonging to Mike Ewing, a friend of Hargrove. The defendant then said, "I'm going to pop a cap in your butt," and he fired two shots in the air.

Shortly after the shots were fired, a police officer arrived. The officer told defendant to drop whatever was in his hand and the defendant refused. After the officer asked again, the defendant eventually complied. The defendant put his hands up. The officer took defendant's right hand and put it behind his back. The defendant told the officer that he was hurting his hand and that "you don't have to do this." According to defendant, the officer responded, "I will mace your mf'g butt." The defendant stated, "I turned to look at him, and when I turned to look at him he took his mace and maced me." The defendant testified that he is blind in his right eye.

The defendant then testified that the officer "let me go * * * for some reason, and I was rubbing my eyes and then I seen a headlight of his car, I seen him in front of his headlight in front of his car pulling his weapon at that time." The defendant was "scared," so he reached in his back pocket for his gun. According to the defendant, "[A]s far as everything started happening, you know, he shot and I shot, and then everything got quiet." The defendant stated that he could not see where he was shooting. The defendant heard the officer say he needed assistance. The defendant "got frightened" and started walking between two houses.

According to the defendant, when he got near a fence, "[T]he officer started firing, * * * again shots at me." The defendant fell over the fence; he then got up and went to the house of his wife, Roberta Booth, at 1872 Minnesota Avenue.

When he arrived at Booth's house, he took off his shirt and rinsed his eyes with water. A short time later, there was a knock at the door. The defendant knew it was the police. The defendant told Booth, "[D]on't let them in right now, * * * but don't tell them that I am not here." After the officers had questioned Booth for a while, the defendant "jumped from behind the door" and said, "[M]y wife do not have to lie."

On cross-examination, the defendant denied that he threatened to kill everyone in the Hargrove house if he did not receive his money. He stated that, instead of leaving after he received no response at the house, he sat down and had another

beer. According to defendant, "I guess at the time when you're sitting there drinking and you're thinking about things at that very particular time, I figured another beer wouldn't hurt."

The defendant acknowledged that he immediately knew that the person who arrived at the scene was a police officer. The defendant did not believe the officer had a legitimate reason to approach him because "he didn't know if it was me or not who was making the noise at all." The defendant stated that he was completely cooperative with the officer at all times. He denied that he pulled away from the officer or that he pushed off of him. According to the defendant, the officer fired his weapon first. The defendant stated that he was not a violent man, but "I like to argue at times."

Following deliberations, the jury returned verdicts finding defendant guilty of felonious assault, including the firearm specification, and carrying a concealed weapon. The trial court sentenced defendant by entry filed June 23, 1998.

On appeal, defendant sets forth the following single assignment of error for review:

"The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence."

Under his single assignment of error, defendant challenges his conviction for felonious assault as to both the sufficiency and weight of the evidence. Defendant's main contention is that there was insufficient evidence to show that he acted either purposely or knowingly during the shooting incident.

In considering a claim that a conviction is not supported by sufficient evidence, "the evidence must be construed in a light most favorable to the prosecution, and the reviewing court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Conley* (Dec. 16, 1993), Franklin App. No. 93AP–387, unreported, 1993 WL 524917, citing *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. However, the test for reviewing the manifest weight of the evidence is slightly different, and "the evidence is not construed most strongly in favor of the state." *Conley.* Rather, "the appellate court must engage in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt." *Id.*

Defendant was convicted of felonious assault under R.C. 2903.11(A)(2), which provides in part that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or

dangerous ordnance." R.C. 2903.11(B) states that "[i]f the victim of the offense is a peace officer, as defined in section 2935.01 of the Revised Code, felonious assault is a felony of the first degree." R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

In considering the sufficiency of the evidence and construing the evidence in a light most favorable to the state, the record indicates that on August 2, 1997, Columbus Police Officer Paul Boldin responded to a report of a suspect firing a weapon in a residential neighborhood. Upon arriving at the scene, Officer Boldin heard the sound of a male shouting, followed by the sound of shots coming from the direction of a cul-de-sac.

Officer Boldin then drove his cruiser to the cul-de-sac and shined a light on the defendant. The officer told defendant to get on the ground and show his hands, but the defendant refused. The defendant told the officer to "go ahead and shoot me." The man finally put down a six-pack of beer, and the officer then approached the defendant and attempted to escort him to the cruiser. When Officer Boldin grabbed the defendant's arm, the defendant pushed the officer away. The officer then attempted to subdue the defendant with mace. The defendant started to run away from the officer, but he then reached into his pocket, took out a handgun, turned back toward the officer, and shot him in the leg. The officer returned fire, but the defendant fled the scene.

■ Upon review, we conclude that there was evidence from which the jury could find the essential elements of felonious assault upon a peace officer proven beyond a reasonable doubt. Specifically, there was sufficient evidence presented that defendant "knowingly" caused or attempted to cause physical harm to Officer Boldin. "A defendant's state of mind must be inferred from the totality of the circumstances surrounding the alleged crime." *State v. Workman* (1992), 84 Ohio App.3d 534, 536, 617 N.E.2d 723, 725, citing *State v. Hardin* (1984), 16 Ohio App.3d 243, 245, 16 OBR 266, 269, 475 N.E.2d 483, 486.

■ In the present case, defendant acted in a belligerent manner when the officer arrived, saying to Officer Boldin, "[F]uck you, go ahead and shoot me." When the officer attempted to grab defendant's arm, he pushed him away. Further, although the defendant first started to move away from the officer, he then pulled out a gun, turned toward the officer, and shot him in the leg. While the facts indicate that both the officer and defendant fired shots during the incident, the evidence construed most strongly in favor of the state indicates that defendant fired first. The act of firing a weapon in a place where one or more

persons face a risk of injury supports an inference that a defendant acted knowingly. *State v. Miller* (June 15, 1995), Franklin App. No. 94APA10–1458, unreported, 1995 WL 360234, citing *State v. Gregory* (1993), 90 Ohio App.3d 124, 131, 628 N.E.2d 86, 91. In the present case, the jury could have reasonably found from the surrounding circumstances that defendant, in firing at the officer, was aware that his conduct would probably cause harm. Accordingly, there was sufficient evidence to support the conviction for felonious assault.

Nor do we find, as asserted by defendant, that the jury lost its way and rendered a verdict against the manifest weight of the evidence. In the present case, the trier of fact heard conflicting testimony regarding the events at issue. As noted, the defendant testified that he was scared after being maced and that he did not shoot at the officer until after the officer had fired his weapon. In direct contrast, Officer Boldin testified that he fired his weapon only after being hit first by gunfire from the defendant. Officer Boldin's version that defendant shot first was corroborated by the testimony of Nathan Spotts. Spotts also corroborated the officer's testimony that defendant pushed away from the officer after the officer grabbed defendant's arm. The testimony of Boldin and Spotts was in direct conflict with defendant's testimony that the officer simply let him go. The jury was in the best position to judge the credibility of the witnesses.

Furthermore, the jury was not required to accept defendant's self-serving testimony that he shot randomly after the officer sprayed him with mace. Specifically, while defendant testified that, after being maced, he was able to see the officer pull his gun and point it at him, defendant nevertheless denied that he could see where he was shooting or where the officer was standing because of the effects of the mace. Moreover, "the mere act of firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause physical harm." *State v. Dukes* (June 18, 1998), Cuyahoga App. No. 71397, unreported, 1998 WL 323538. The weight to be given the evidence and the credibility of witnesses are primarily matters for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. In the present case, it is apparent that the jury chose to believe the testimony of the officer and the other witnesses over that of the defendant. It was within the province of the jury to make this determination and we do not find, on the record in this case, that the jury lost its way in rendering a guilty verdict. Rather, there was sufficient, competent credible evidence to permit a reasonable jury to find guilt beyond a reasonable doubt.

Finding that the conviction was supported by sufficient evidence and that the judgment was not against the manifest weight of the evidence, we overrule

**564**

defendant's single assignment of error. Based upon the foregoing, the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

PETREE and KENNEDY, JJ., concur.