[Cite as *State v. Stewart*, 2023-Ohio-1494.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 22AP-370 |
| v. | : | (C.P.C. No. 21CR-4264) |
| Savontae D. Rigsbee, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

———————

D E C I S I O N

Rendered on May 4, 2023

———————

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

———————

APPEAL from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1} Defendant-appellant, Savontae D. Rigsbee, appeals the judgment of the Franklin County Court of Common Pleas, which convicted him of one count of domestic violence, in violation of R.C. 2919.25, a third-degree felony. In a single assignment of error, Rigsbee argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. For the following reasons, we overrule Rigsbee's assignment of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} Rigsbee was indicted on one count of domestic violence in violation of R.C. 2919.25, for knowingly causing or attempting to cause physical harm to A.A., a family or household member, on or about August 14, 2021. The indictment alleged that Rigsbee had previously been convicted of or pleaded guilty to offenses of attempted endangering

children and criminal mischief involving victims who were family or household members. Rigsbee entered a plea of not guilty and waived his right to a jury trial. The case proceeded to a bench trial on April 19, 2022.

{¶ 3} Rigsbee and A.A. entered into a relationship in 2016. They have two children together. At the time of trial in April 2022, those children were one and three years old. A.A. also has a third child, who was five years old at the time of trial and for whom Rigsbee "takes responsibility." (Apr. 19, 2022 Tr. at 10.) In August 2021, A.A. was living in a townhouse with her children and a roommate, C.H.. A.A. and her children used the two upstairs bedrooms, and C.H. slept in the finished basement. Rigsbee had recently been granted judicial release from prison, which A.A. had supported. Rigsbee and A.A. were "figuring out" their relationship and whether they were going to "get[] back together." (Tr. at 10.) A.A. described Rigsbee's living situation as "back and forth between my house and another female." *Id*. at 11.

{¶ 4} A.A. testified at trial about the events of August 13 and 14, 2021. On August 13, 2021, A.A. worked from 8:00 a.m. to 5:00 p.m. While she was at work, she lent her truck to Rigsbee, purportedly to follow up with his probation officer and to visit a child that Rigsbee had with another woman. She testified that Rigsbee picked her up from work in her truck, that they picked up the children, and that they took them to Chuck E. Cheese. She estimated that they arrived back at her house around 9:30 or 10:00 p.m., after which they put the children to bed and went to sleep. The two older children were sleeping on a toddler-bed mattress that A.A. had placed at the foot of her bed, in front of a TV stand, and the younger child was in a pack-and-play next to the bed. A.A. had agreed that Rigsbee could spend the night with her.

{¶ 5} A.A. claimed that Rigsbee woke her at about 1:00 a.m. Rigsbee was trying to access A.A.'s cellphone and asked why she had changed her password.[1] When A.A. refused to give him her new password, Rigsbee told her to drive him to another woman's house, but A.A. again refused. A.A. testified that Rigsbee, not taking no for an answer, awakened the children by yelling, "Get the F up, it's time to go." (Apr. 19, 2022 Tr. at 17.) A.A. told the children to lie back down and that they were not going anywhere.

---

[1] A.A. acknowledged it was not unusual for Rigsbee to play games or listen to music on her cellphone during the night, while she slept.

{¶ 6}  According to A.A., when she continued to refuse to drive Rigsbee anywhere, he kicked the TV, which fell onto the children lying at the foot of the bed and began to stomp on it.  (Tr. at 19-20.)  He then jumped onto the bed and punched her in the face, breaking her glasses.  Meanwhile, the two older children hid in the closet, while the youngest child remained in his pack-and-play.  A.A. testified that Rigsbee punched her, kicked her, choked her, grabbed her hair, dragged her, and bit her on the back.  (Tr. at 20-21, 55.)

{¶ 7}  During the altercation, A.A. was able to get downstairs and call Rigsbee's mother, who refused to help.  She testified that after she threatened to call the police because he would not leave, Rigsbee kicked her ribs and tried to grab her cellphone, saying, "Bitch, I'm gonna give you a reason to call the police * * * because I'm gonna kill you."  She claimed that, when she eventually let go of her cellphone, Rigsbee threw it and broke it.  (*Id.* at 25.)

{¶ 8}  C.H., A.A.'s roommate, whom A.A. claimed witnessed the struggle over her phone, removed Rigsbee from the house, but A.A. did not know where she took Rigsbee.  (Tr. at 24-25, 52-53.)  Rigsbee had taken the keys to A.A.'s truck when he left, so while C.H. was gone, A.A. had no access to a telephone (because hers was broken) or a vehicle.  When C.H. returned, she brought with her A.A.'s truck keys.  A.A. then drove to a friend's house, and that friend drove her to A.A.'s grandmother's house, where C.H. later brought A.A.'s children.

{¶ 9}  A.A. was hesitant to file charges against Rigsbee because he had just gotten out of prison and she "didn't want to put him in the position to have to go back."  (Tr. at 32.)  Nevertheless, she did report the incident to the police, who responded to her grandmother's house.  A.A. gave the police a written statement, which was consistent with her trial testimony.  At trial, A.A. identified photos taken by the police officers of her injuries.  Those injuries included a mark on her right eye where her glasses broke, "busted" lips, and bite marks on her back.  *Id.* at 29.  She stated that she had to wear makeup to conceal a black eye for at least a week and a half after the incident.  (Tr. at 28.)

{¶ 10}  Columbus Police Officer Steven Shope, who responded to A.A.'s report of domestic violence, also testified for the state.  Officer Shope confirmed that A.A. had visible injuries to her face and lips and a bite mark on her back, and he identified those injuries in

the police photographs. He further testified that A.A. had identified Rigsbee as the perpetrator of the domestic violence against her.

{¶ 11} Rigsbee testified in his defense and denied much of A.A.'s account. He did not remember going to Chuck E. Cheese the night leading up to the alleged domestic violence. He instead recalls working that day, taking a ride-share to A.A.'s house, and staying in all evening. Rigsbee claimed that he was awakened during the night by A.A.'s cellphone "going off" and that he could not unlock it. *Id.* at 90. He agreed that he and A.A. had argued because she had changed her cellphone passcode without giving it to him. He testified that, when A.A. refused to take him somewhere else, he got "frustrated" and "started slamming stuff." *Id.* at 92. Rigsbee confirmed that A.A. called his mother and told her she wanted Rigsbee to leave. And he testified that C.H., A.A.'s roommate, drove him "to my baby mama's house." *Id.* at 109.

{¶ 12} Rigsbee denied hitting, biting, or choking A.A., and he denied blackening her eye, breaking her phone, or breaking her glasses. He stated, however, that A.A. did not have the injuries shown in the police photographs earlier on August 13 or 14 and that the pictured injuries appear "fresh." *Id.* at 109. Other than the young children, A.A., Rigsbee, and C.H. were the only people in A.A.'s townhouse on the night of the alleged domestic-violence incident.

{¶ 13} By August 17, 2021, Rigsbee had learned from three different people—A.A., C.H., and his probation officer—that there was a warrant for his arrest for domestic violence. He also learned on August 17 that he had been declared an absconder for not reporting to his probation officer—a requirement of his judicial release. Rigsbee did not turn himself in, nor did he contact his attorney, his probation officer, or the police detective to assert his innocence to the domestic-violence charge. He was arrested on October 4, 2021.

{¶ 14} The record contains conflicting evidence of contact between Rigsbee and A.A. between the date of the alleged domestic violence and the date of Rigsbee's arrest. Rigsbee claimed that he saw A.A. between five and 15 times between the middle of August and his arrest in October. He stated that they would "meet up, chill, smoke, * * * [t]alk about trying to fix it, if we was able to fix our relationship." *Id.* at 97-98. A.A., on the other hand, testified that she did not see Rigsbee socially between August and October, but stated that he did

come over once so they "could have a talk." *Id.* at 60. She had, however, subsequently spoken to Rigsbee by phone while he was in jail.

{¶ 15} The trial court found Rigsbee guilty of domestic violence, as charged in the indictment. The court explained:

> I found A.A. to be very credible on the stand. I saw a woman who didn't take pleasure in testifying today. I saw a woman who felt like she had no other choice but to finally put her foot down in an abusive relationship. I think she was honest when she said all she wanted was somebody who would be a father to her children and not assault her. * * * I think the photos do show injuries. That's clearly a bite mark on her back. There is no other explanation for the injuries. * * * I find A.A.'s testimony to be quite compelling.

(Apr. 19, 2021 Tr. at 128.) On May 19, 2022, the court sentenced Rigsbee to 24 months in prison, to be served consecutively to his sentence in Franklin C.P. No. 18CR-4569.

{¶ 16} This court granted Rigsbee leave to file a delayed appeal. Now, in a single assignment of error, he argues that his conviction is not supported by sufficient evidence and/or is against the manifest weight of the evidence.

## II. ANALYSIS

{¶ 17} Sufficiency and manifest weight of the evidence are distinct legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). A finding that a conviction is supported by the manifest weight of the evidence, however, necessarily includes a finding that the conviction is supported by sufficient evidence and will therefore be dispositive of the issues of sufficiency of the evidence. *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 11. We therefore first consider whether Rigsbee's conviction is supported by the manifest weight of the evidence.

{¶ 18} With respect to the weight of evidence, the Supreme Court of Ohio has explained:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). A challenge to the manifest weight of the evidence presents a question of persuasion. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19.

{¶ 19} When reviewing a challenge to the manifest weight of the evidence, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reversal on manifest weight grounds is warranted only in " 'exceptional case[s] in which the evidence weighs heavily against conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 20} While we must consider the credibility of witnesses in conducting a manifest weight review, we are guided by the presumption that the trial court, which heard the testimony and was able to observe the witnesses' demeanors, inflections, gestures, and mannerisms, is in the best position to judge the witnesses' credibility. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 21} Here, we need not engage in conjecture regarding the trial court's assessment of the witnesses' credibility; the court made abundantly clear that it believed A.A.'s version of events, describing her testimony as "quite compelling" and "very credible." (Apr. 19, 2022 Tr. at 128.) When conflicting testimony has been presented, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution's testimony. *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 13, citing *State v. Moore*, 2d Dist. No. 20005, 2004-Ohio-3398.

{¶ 22} To establish Rigsbee's guilt of domestic violence, as alleged in the indictment, the state was required to prove that he "knowingly cause[d] or attempt[ed] to cause physical harm to a family or household member."[2] R.C. 2919.25(A). A.A. qualified as a "family or

---

[2] The parties stipulated that, as alleged in the indictment, Rigsbee had previously been convicted of first-degree misdemeanor criminal mischief and fourth-degree felony attempted child endangering and that those convictions satisfied the requirements to enhance the domestic violence charge to a third-degree felony. (Tr. at 116-17; Exs. B & C.)

household member" of Rigsbee because she was "[t]he natural parent of any child of whom [Rigsbee] is the other natural parent." R.C. 2919.25(F)(1)(b).

{¶ 23} The only disputed issue was whether Rigsbee knowingly caused or attempted to cause A.A. physical harm. "Physical harm" is defined as including "any injury * * *, regardless of its gravity or duration." R.C. 2901.01(A)(3). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). When determining whether a defendant acted knowingly, his state of mind may be inferred from the totality of the circumstances surrounding the conduct. *State v. Baker*, 10th Dist. No. 02AP-339, 2002-Ohio-7031, ¶ 68, citing *State v. Booth*, 133 Ohio App.3d 555, 562 (10th Dist.1999).

{¶ 24} As her testimony specifically relates to the elements of domestic violence, A.A. testified that Rigsbee punched her in the face, breaking her glasses, kicked her, choked her, grabbed her hair, and bit her on the back. (Tr. at 20-21, 24, 55.) She testified that she fell down each time Rigsbee hit her, "because he hits so hard." (Tr. at 22.) She stated that after she called his mother and threatened to call the police, Rigsbee threatened to kill her and began kicking her in the ribs. (Tr. at 24.) A.A. testified as to the injuries she sustained as a result of Rigsbee's conduct, and both she and Officer Shope identified the representations of those injuries in the police photographs that were admitted into evidence. As part of the broader context of the incident, A.A. also testified that Rigsbee had kicked and stomped on her TV and broken her cellphone.

{¶ 25} In a brief and conclusory argument in support of his assignment of error, Rigsby challenges A.A.'s credibility, characterizing her version of events as "suspect." (Appellant's Brief at 2.) He claims that A.A.'s testimony that he kicked the TV, which fell onto the children, and stomped on it is unworthy of belief because there was no corroborating evidence that the children were injured or of physical damage to the TV. He likewise points to the absence of other evidence to corroborate A.A.'s testimony that he destroyed her cellphone. He also maintains that the photographs of A.A.'s injuries do not corroborate A.A.'s testimony that Rigsbee punched, kicked, dragged, choked, and bit her. He notes that A.A. did not seek medical treatment for her injuries and that she waited several hours before calling the police.

{¶ 26} Rigsbee's arguments focus primarily on the absence of other evidence to corroborate A.A.'s testimony, but those arguments are unpersuasive. Neither the absence of evidence of the specific physical damage to A.A.'s property nor the absence of medical evidence concerning injuries suffered by A.A. or her children, by itself, renders A.A.'s own testimony unworthy of belief, and we may not second-guess the trial court's resolution of the witnesses' credibility.

{¶ 27} The testimony of one witness, if believed, is enough to support a conviction. *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42, citing *State v. Dunn*, 5th Dist. No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133. The absence of corroborating physical evidence does not negate the testimony of a witness to a crime. *State v. Lundy*, 8th Dist. No. 90229, 2008-Ohio-3359, ¶ 12, citing *State v. Owens*, 9th Dist. No. 19932, 2001 Ohio App. LEXIS 173 (Jan. 24, 2001). Therefore, a lack of physical evidence, standing alone, does not render a conviction against the manifest weight of the evidence when witness testimony is believed. *See State v. Peters*, 10th Dist. No. 13AP-748, 2014-Ohio-1071, ¶ 10, 12 (affirming convictions for carrying a concealed weapon and having a weapon while under a disability, despite the lack of physical evidence linking defendant to the recovered handgun).

{¶ 28} In *State v. Dudley*, 9th Dist. No. 28364, 2017-Ohio-7044, the Ninth District Court of Appeals rejected a manifest weight challenge to a robbery conviction and held that the state was not required to present photographic or medical evidence to support a security guard's testimony that the defendant inflicted, attempted to inflict, or threatened to inflict physical harm. Similarly, the Second District Court of Appeals has rejected a manifest weight challenge to a conviction for assaulting a police officer despite the absence of evidence to corroborate the testimony of the officer victim. *State v. Totty*, 2d Dist. No. 23372, 2010-Ohio-1234. In *Totty*, the court stated, "[a]lthough physical evidence may be helpful to prove a case, it is not necessary," and it held that the officer's testimony "was adequate direct evidence upon which a rational juror could rely in finding [the defendant] guilty beyond a reasonable doubt." *Id.* at ¶ 21. Here, the absence of evidence to corroborate A.A.'s testimony that Rigsbee kicked over and smashed her television and broke her cellphone does not so undermine the credibility of A.A.'s testimony that the trial court could

not rationally rely on that testimony to find the elements of domestic violence had been proven beyond a reasonable doubt.

{¶ 29} As to the absence of medical evidence and Rigsbee's attempt to downplay A.A.'s injuries, as testified to by A.A. and Officer Shope and as depicted in the police photographs, we note that R.C. 2919.25 requires only that the offender has caused or attempted to cause "physical harm," which includes *any* injury, regardless of its severity. R.C. 2901.01(A)(3). Rigsbee questions the severity of A.A.'s injuries, but he does not contest that A.A. had "fresh injuries" in the aftermath of their argument, which she did not have earlier that day. (Apr. 19, 2022 Tr. at 109.)

{¶ 30} Rigsbee also admits that the only adults in the house at the time of the altercation were he, A.A., and C.H., who was in the basement for much of the relevant time. His attempt to downplay the severity of A.A.'s injuries does not render the trial court's belief in A.A.'s testimony unreasonable. The trial court could have rationally relied on A.A.'s and Officer Shope's testimony and the photographs of A.A.'s injuries to conclude beyond a reasonable doubt that Rigsbee knowingly caused physical harm to A.A. and was guilty of domestic violence.

{¶ 31} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we conclude that the trial court did not clearly lose its way and create such a manifest miscarriage of justice that Rigsbee's conviction must be reversed. Accordingly, we reject Rigsbee's argument that his conviction is against the manifest weight of the evidence. That conclusion likewise disposes of Rigsbee's argument that his conviction is not supported by sufficient evidence.

## III. CONCLUSION

{¶ 32} Because Rigsbee's conviction for domestic violence was supported by sufficient evidence and is not contrary to the manifest weight of the evidence, we overrule Rigsbee's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and LELAND, JJ., concur.

———————————————